Donald Gibson
Sandra Gibson
11876 Abington Street
Riverside, CA 92503
714-743-9366

PER PRO



**FILED**

NOV 03 2010

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION

|  |  |
|---|---|
| | ) **Case No. 6:10–BK–21907-DS** |
| | ) |
| | ) **Chapter 7** |
| | ) |
| | ) **REQUESTING A** BANKRUPTCY **COURT** |
| | ) **HEARING.** OPPOSITION TO–MOTON FOR ORDER |
| GIBSON DONALD RAY, | ) APPOVING COMPROMISE OF CONTROVERSY |
| GIBSON,SANDRA MAE, | ) BETWEEN CHAPTER 7 TRUSTEE AND JURUPA |
| | ) VALLEY SPECTRUM – PHASE 1 LLC; |
| | ) MEMORANDUM OF POINTS AND AUTHORITIES |
| | ) AND DECLARATION OF STEVEN M. SPEIER IN |
| | ) SUPPORT THEREOF |
| Debtor(s) | ) DATE JAN. 6, 2011 |
| | ) Time        1:30 PM |

TO THE HONORABLE DEBORAH J. SALTZMAN, UNITED STATES BANKRUPTCY

JUDGE, UNITED STATED TRUSTEE, AND ALL OTHER PARTIES IN INTEREST:

Donald and Sandra Gibson debtors do not agree with the Trustee

Steven M Speier about the value of our lawsuit case against

Jurupa Valley Spectrum in Riverside Superior Court #502124. We

know that this case is valued at $400,000.00 or more. We are

asking the court **not** to approve the compromise. We are attaching

1  a true copy of our fourth amended complaint from Riverside

2  Superior court #502125. The fourth amended complaint will tell

3  you about the lawsuit. **Exhibit #1** The Fourth Amended Complaint

4  for Breach of Contract, Misrepresentation:

5  Interference with Prospective Business Relation, **Exhibit #2**

6  **Riverside Superior Court Case MVC 1000018** , Defendants reply to

7  Plaintiffs Memorandum or points and authorities in support of

8  motion for Summary Judgment or, in the Alternative Summary

9  Adjudication, including Declaration from Sharon Ratlift and

10 Arturo Gonzales.

11 The Gibsons are asking the court to release the stay of action

12 and let the Gibsons go forward with their lawsuit.  The Gibsons

13 are requesting for a Bankruptcy Court hearing. The Gibsons filed

14 the following charges against Jurupa Valley Spectrum in

15 Riverside Superior Court.

16

17                    **1. Breach of contract**

18                    **2. Declaratory relief**

19                    **3. Intentional misrepresentation**

20                    **4. Negligent misrepresentation**

21                    **5. Breach of oral/implied-implied contract**

22                    **6. Racial Discrimination**

23                    **7. Interference with prospective economic**

24                         **Relations**

25 Jurupa told the Trustee Steven M. Speier that the Gibsons did

26 not pay August, September and October 2009 rent. That is **totally**

27 **wrong.** The Gibsons did pay August and September 2009 rent.

28 Jurupa mailed September 2009 rent check back to the Gibsons. The

1  Gibsons have September 2009 returned check in the same unopened
2  envelope that the check was mail in. Jurupa said they did not
3  receive August 2009 rent check, Jurupa set the Gibsons up. The
4  Gibsons mail their rent checks via Wells Fargo Bank Online
5  Quicken.   The Gibsons have been mailing checks for three years
6  via Wells Fargo Bank Online Quicken to Jurupa. Jurupa have
7  always received their checks until August and September 2009
8  when Jurupa claimed they did not received the checks. 20 years
9  the Gibsons have been using online Quicken, the Gibsons never
10 had any checks lost in the mail or returned. The reason the
11 Gibsons stopped paying the rent is because Jurupa would not
12 accept the rent checks. Jurupa were setting the Gibsons up to
13 fail. Jurupa would not repair the roof so that was one more
14 reason why the Gibsons stopped paying the rent after September
15 2009. The Gibsons did have the money at that time to pay the
16 rent. The Gibsons also asked Jurupa to come by the restaurant
17 and pick the rent checks up. Jurupa never came by to pick the
18 rent checks up.

19   **Exhibit #3**.3 Wells Fargo Bank Detail Letters and September 2009
20 rent check in an unopened envelope.

21 Jurupa Valley Spectrum Breach the contract by not fixing the
22 roof for approximately two years and six months. The Gibsons had
23 water coming from the roof until the ceiling fall down. Working
24 condition was very bad and unsafe when the water leaked from the
25 roof. Riverside County Health Department closed the Gibsons
26 restaurant down before the Gibsons were evicted. The Ceiling was
27 down for approximately one year. See **Declarations from Sharon**
28 **Ratlift and Arturo Gonzales.**

1  The Gibson asked Jurupa to fix the roof for two years. Jurupa
2  broke the law it is call (Constructive Eviction in Modern
3  Commercial Leases) copy attach. 7.1 Of Jurupa lease stated that
4  Jurupa is responsible for fixing the roof. See page 10 of the
5  lease. **Exhibit #4** Pictures of the Roof and Ceiling. **Exhibit #5**
6  Health Department Report. **Exhibit #6** emails from Jurupa Valley
7  Spectrum and Donald Gibson about the roof. **Exhibit #7** Allied
8  Insurance Company Report about the roof. **Exhibit #8** Jurupa lease
9  in part Page 10.7.1.**Exhibit#9** Letters from Jurupa Community
10 Services District about the Grease Interceptor.

11 **SETTLEMENT BETWEEN TRUSTEE AND JURUPA VALLEY**

12 The Gibsons is asking the court **not** to approve the compromise
13 between Trustee and Jurupa Valley Spectrum for only $5,000.00.
14 The Estate can receive more than $5,000.00 out of this case. The
15 Gibsons is asking the court to release the stay and take over
16 the case for trail or let the Gibsons go forward with their
17 lawsuit against Jurupa Valley Spectrum in Riverside Superior
18 Court. The Gibsons feel the case is valued at $400,000.00 or
19 more.

20

21 **SETTLEMENT AGREEMENT AND RELEASE**

22 Architectural Ventures, 1 LLC is the Property Management Company
23 they are not part of the Bankruptcy they should not be in this
24 Bankruptcy. Architectural Ventures is getting a free ride. They
25 have not filed anything.

26 **RECITALS**

27 The Trustee stated in F. "the lease specifically requires the
28 Gibsons to install a grease interceptor." That is **incorrect**. The

1  lease does not say anything about a Grease Interceptor. The
2  Gibsons was told and showed a Grease Interceptor by Cynthia
3  Huber Site Property Manager at that time.

4

5  After doing about $50,000.00 of work inside the restaurant the
6  Gibson found out that it was no Grease Interceptor for the
7  Gibsons restaurant. The Gibsons had to purchase Grease
8  Interceptor for $13,000.00. The Gibsons wouldn't have leased the
9  restaurant if the Gibsons had known there was not a Grease
10 Interceptor for the restaurant. **See Letter from Jurupa Community**
11 **Services District.**

12

13 The Trustee stated in L. "The Gibsons failed to pay their rent
14 when due for the months of August, September and October 2009".
15 **That is totally wrong.**   The evidence does show that The Gibsons
16 did attempt to pay August and September 2009 rent. Jurupa told
17 the Gibson that they did not receive August 2009 rent. Jurupa
18 mailed September 2009 rent check back to the Gibsons. The
19 Gibsons mails Jurupa rent via Wells Fargo Bank online Quicken.
20 The Gibsons has been mailing rent checks for three years via
21 Wells Fargo Bank Online Quicken and Jurupa have always received
22 the Gibsons checks until August and September 2009.

23

24

25

26 **CONCLUSION**

27 The Gibsons are asking for a Bankruptcy Court Hearing. The
28 Gibsons believe that the Civil Court made an error in giving

1  Jurupa Valley Spectrum a judgment. The Gibsons told the Civil
2  Court that the Gibsons want to go to trail to explain and show
3  the Gibsons evidence and the Civil Court denied the Gibsons
4  right to go to trial. The Gibsons are asking the Bankruptcy
5  Court to look at all the evidence and **overturn the Civil Court**
6  **Judgment**. The Gibsons do not believed the $5,000.00 compromise
7  between the Trustee Steven M Speier and Jurupa Valley Spectrum
8  is fair or right. Jurupa is the one that force the Gibsons into
9  Bankruptcy. The Gibsons are asking for Architectural Ventures,
10 1LLC to be removed from the Bankruptcy case, Architectural
11 Ventures, 1 LLC are not part of the Bankruptcy Case. The bottom
12 line is Jurupa Valley Spectrum broke the law **{Constructive**
13 **Eviction in Modern Commercial lease)**.Jurupa Valley Spectrum has
14 **retaliated and discriminated** against the Gibsons. This is the
15 United State of American land of the free; no one should be
16 treated like Jurupa Valley Spectrum treaded the Gibsons.
17 Everybody dreams and the Gibsons had a good dream and Jurupa
18 Valley Spectrum took a good dream from the Gibsons and made it
19 in to a nightmare... The Gibsons think Jurupa Valley Spectrum is
20 a deceitful business.

21

22     **WHEREFORE**, The Gibsons prays that the Court look at all the
23 evidence that the Gibsons have demonstrated to the court and
24 overturn the judgment and do not approve the compromise of the
25 controversy between the Trustee and Jurupa Valley Spectrum.

26

27

28

November 1, 2010

Donald Ray Gibson

Pro Per

November 1, 2010

Sandra Mae Gibson

Pro Per

4/30/10

1  DONALD RAY GIBSON
   SANDRA MAE GIBSON
2  11876 Abington
   Riverside, CA 92503
3  (714) 743-9366

4

   In Pro Per
5

6

7

8

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

APR 3 0 2010

V. Reyes

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF RIVERSIDE**

**CIVIL DIVISION**

| | |
|---|---|
| DONALD RAY GIBSON, an individual; SANDRA MAE GIBSON, an individual, | Case No.  RIC 502124 |
| Plaintiffs, | FOURTH AMENDED COMPLAINT FOR BREACH OF CONTRACT; MISREPRESENTATION;  RACIAL DISCRIMINATION; INTERFERENCE WITH PROSPECTIVE BUSINES RELATIONS |
| v. | |
| JURUPA VALLEY SPECTRUM – PHASE 1 LLC, a California limited liability company and DOES 1 through 10, inclusive, | Date: Time: Dept.:        5 Hon. Mark E. Johnson |
| Defendants. | |
| AND RELATED CROSS-ACTION | Complaint filed:    June, 2008 Trial Date:         None set |

Plaintiffs Donald Ray Gibson and Sandra Mae Gibson, doing business as Mr. G's Restaurant, Inc. ("the Gibsons" and/or "Plaintiffs") hereby allege as follows:

## GENERAL ALLEGATIONS

1.    The Gibsons are, and at all times relevant herein were, residents of the City of Riverside, California, and doing business under the fictitious business name of Mr. G.'s Restaurant, Inc., located at 8022 Limonite Avenue, Unit 101, Pedley, California.

Exhibit 1

2.    Plaintiffs are informed and believe, and thereon allege, that Jurupa Valley Spectrum-Phase 1, LLC (hereinafter "Jurupa Valley Spectrum" or "JVS") is a California limited liability company, doing business in the County of Riverside, with its principal place of business located at 10390 Santa Monica, Blvd., Los Angeles, California.

3.    Plaintiffs are informed and believe, and thereon allege, that Architectural Ventures Real Estate Development Company (hereinafter "Architectural Ventures") a limited liability company incorporated in California,  located in West Hollywood, California and doing business in Riverside California.

4.    The true names and capacities, whether individual, corporate, associate or otherwise of the Defendants named herein as Does 2-10, inclusive, are unknown to plaintiffs, who therefore sue said Defendants by such fictitious names, and Plaintiffs will amend this complaint to show their true names and capacities when same have been ascertained.

5.    Plaintiffs are informed and believe, and thereon allege, that each of the defendants designated as a Doe is responsible in some manner for the events and happenings herein alleged and caused injuries and damages proximately thereby to Plaintiffs as herein alleged.

6.    At all times herein mention, each of the Defendants herein was the agent employee, and alter ego of each of the remaining Defendants, and was at all times acting within the course and scope of said agency and employment.

7.    Plaintiff is informed and believes, and upon such information and belief alleges that defendants, and each of them, conspired and agreed among themselves to do the acts complained of herein and were, in committing such acts, acting pursuant to and in furtherance of said conspiracy.

8.    Plaintiff further alleges that each defendant sued herein is jointly and severally responsible and liable to her for the damages alleged herein.

9.    The obligations sued upon were incurred and were to be performed, or are payable in the within judicial district of the County of Riverside, State of California.

FOURTH AMENDED COMPLAINT

1

## FIRST CAUSE OF ACTION

2

## (BREACH OF CONTRACT-LEASE)

3

## (AS AGAINST ALL DEFENDANTS)

4

5      10.      The Gibsons reallege and incorporate by reference, paragraphs 1 through 9,

6   inclusive of the General Allegations, as if set forth in full.

7      11.      In early 2007, the Gibsons and Jurupa Valley Spectrum, entered into a lease

8   agreement ("Lease") , whereby Jurupa Valley Spectrum agreed to lease retail/restaurant space to

9   Plaintiffs located at 8022 Limonite Avenue, Unit 101, in City of Pedley, California.  Tenant took

10  possession of the premises to complete tenant improvements, with the actual rent commencement

11  date (agreed to by the parties) to be May 1, 2007.  The lease is attached hereto as Exhibit "1" and

12  is incorporated herein.

13      12.      Paragraph 7.3, entitled Landlord's Obligation, provides in relevant part as follows:

14  "Landlord agrees to maintain and repair Phase One and its Common Areas (including without

15  limitation, any heating, ventilation and air conditioning system for the Common Areas, the load

16  bearing and exterior walls in Phase One, the other structural elements in Phase One, any gutters

17  and down spouts in Phase One, *plumbing*, electrical and any other utility service in Phase One

18  which is delivered to the Premises. . .in a first class manner so as to keep them in good order,

19  clean condition and repair *and in compliance with all applicable legal requirements (including*

20  *replacement, upgrading or the installation of new improvements when required)...*"(Emphasis

21  added.)

22      13.      Prior to entering in the Lease, Cynthia Huber, the agent for Defendants

23  represented, that "grease interceptor" had been installed for prior tenant, and that upon

24  completion of the Gibsons' tenant improvements, the restaurant would be ready for operation and

25  would be in full compliance with all applicable Riverside County and Jurupa Community

26  Services District Code requirements for operating restaurants.

27      14.      In or about early March, 2007, when Plaintiffs had completed their tenant

28  improvements and were ready to open for business, they received notice from Jurupa Community

FOURTH AMENDED COMPLAINT

1   Services District (after an inspection of the subject property), that the required "grease

2   interceptor" had not been installed and that until it was properly installed, the restaurant was

3   prohibited from operating for business.  Plaintiffs were subsequently notified by the inspector

4   from the Jurupa Community Services District, that Cynthia Huber's representation that a "grease

5   interceptor" had been installed outside the subject premises (to prevent grease from entering the

6   sewer system), was incorrect and that the unit was never up to the required code requirement of

7   the Jurupa Community Services District.

8       15.    Upon receipt of the August 2nd letter from the Jurupa Community Services

9   District, Plaintiffs forwarded this letter along with bills and other receipts in excess of $13,000,

10  seeking reimbursement for the entire cost associated with installing a "grease interceptor."

11      16.    The Gibsons have performed all conditions, covenants, and promises required to

12  be performed on their part in accordance with the terms of the Lease.

13      17.    Defendants have breached the Lease in the following way:

14          a.    Defendants have violated the express provision of Paragraph 7.3 of the

15  Lease.  Paragraph 7.3 of the Lease requires the Landlord to maintain and repair plumbing to the

16  premises and imposes upon the Landlord an obligation as provided for in the lease to "keep them

17  in good order, clean condition and repair in compliance with all applicable legal requirements (

18  including replacement, upgrading or the installation of the "grease interceptor" on or after August

19  2, 2007, and continuing to the date of the filing of this complaint, constitutes a material breach of

20  the Lease.

21      18.    As a proximate result of Defendants' breach of the Lease, the Gibson have

22  suffered damages in excess of $13000 or in an amount according to proof  at time of trial.

23      19.    As a further result of Defendants' actions, the Gibsons retained the services of

24  Reid & Hellyer to assist and represent this action. Pursuant to Paragraph 26.7 of the Lease, the

25  Gibsons seek recovery for the reasonable attorney's fees incurred in this action.

26

27

28

## SECOND CAUSE OF ACTION

### (Declaratory Relief)

### (As Against All Defendants)

20.    The Gibsons reallege and incorporate by reference, paragraphs 1 through 9 inclusive of the General allegations, a paragraphs 10 through 19, of the First Cause of Action as if set forth in full herein.

21.    An actual controversy has arisen and now exists between the Gibsons and Defendants concerning their respective rights and duties in that the Gibsons are informed and believe and thereon allege that Defendants contend that the Lease does not require them to pay the costs with installation of a "grease interceptor" at the subject premises, whereas the Gibsons dispute this contention and contend that paragraph 7.3 (among the terms of the Lease) requires the Landlord to pay all charges associated with bringing the plumbing into compliance with all applicable legal requirements (including those imposed by the Jurupa Community Services District.

22.    The Gibsons desire a judicial determination of their rights and duties as to the terms of the Lease and whether the Landlord is required under the express terms of the Lease to reimburse all costs incurred by Plaintiffs in constructing a "grease interceptor."

23.    A judicial declaration is necessary and appropriate at this time under the circumstances in order that the Gibsons may ascertain their rights and duties as to the Lease.

## THIRD CAUSE OF ACTION

### (Intentional Misrepresentation)

### (Against All Defendants)

24. The Gibsons reallege and incorporate by reference, paragraphs 1 through 9, inclusive of the General Allegations, and paragraphs 10 through 19, of the First Cause of Action as if set forth in full.

25. Defendants represented to the Gibsons that the unit they were leasing from Jurupa Valley Spectrum (hereinafter JVS) contained a grease interceptor adequate for the operation of

FOURTH AMENDED COMPLAINT

1   the restaurant.

2      26. JVS has a "monument sign" (hereinafter "Marquis") which advertises the vendors in
3   the mall. This Marquis is located at the intersection of Limonite Ave. and Spectrum Center
4   streets. The Marquis is visible to the tens of thousands of pedestrians and motorists who pass by
5   the location on a daily basis. The Gibsons were attracted to JVS as a location for Mr. G's
6   Restaurant, because of the prominence of the Marquis.

7      27. Prior to entering into a contract to rent space at JVS, Mr. Gibson was told by Cynthia
8   Huber, the JVS Site Manager, that he would be entitled to advertise Mr. G's Restaurant on the
9   Marquis. Specifically, he was told "Dairy Queen", the renter that previously rented the space
10   where Mr. G's would be located, advertised on the Marquis and he would be similarly entitled to
11   place his advertisement on the Marquis when he became a renter. Thereafter, on January 7, 2007,
12   with the understanding that they would be entitled to advertise "Mr. G's Restaurant" on the
13   Marquis, the Gibsons leased a commercial space at JVS.

14      28. From approximately December 7, 2007 to January 2008, "Mr. G's Restaurant" was
15   displayed on the Marquis with the express approval of Site Manager Sigi Del Toro. During that
16   period, there was a significant improvement in business at Mr. G's.

17      29. In January 2008, the managers at JVS removed the display banner for Mr. G's
18   Restaurant from the Marquis. Mr. Gibson was advised by Site Manager Del Toro that JVS Head
19   Property Manager Greg Kozak instructed that Mr. G.'s banner be removed from the Marquis.

20      30. On numerous occasions, Mr. Gibson asked the managers of JVS to permit him to
21   advertise on the Marquis. Indeed, from May 2008 to September 2009, Mr. Gibson went to the
22   management visit center, located at JVS, at least twice a month and spoke to numerous JVS
23   representatives and managers, requesting that he be permitted to advertise his restaurant on the
24   Marquis pursuant to the agreement between the parties. Each time that Mr. Gibson requested
25   permission to advertise on the Marquis, JVS denied his request.

26      31. The Gibsons are informed and believe and on that basis allege that, when Defendants
27   made representations regarding the grease trap and Marquis advertisement entitlement, they knew
28   that they were untrue.

32. The representations were untrue; there was no grease interceptor included with the unit and the Gibson's were not entitled to advertise on the Marquis.

33. Defendants made these misrepresentations with the intent to induce the Gibsons to enter into the Lease and expend funds for the purpose of opening a restaurant in the unit. At the time the misrepresentation was made, the Gibsons did not know it was false and believed it was true. The Gibsons acted in justifiable reliance upon the truth of the representation.

34. Since the removal of the display for Mr. G's Restaurant from the Marquis in January 2008, Mr. G's Restaurant has suffered a significant decline in patronage and loss of profits. The decline is not due to any inherent deficit of the restaurant. Mr. G's is the only southern style and BBQ restaurant within twenty miles of the location. The food and service at Mr. G's has received critical acclaim from various local publications. Indeed, numerous preexisting customers and customers who have happened upon the restaurant by chance or through word of mouth have expressed excitement about the food and concern about the absence of JVS advertisements, publishing Mr. G's presence in the mall. Many of these customers have indicated that they would have come in sooner and more frequently if they had seen an advertisement for Mr. G's on the Marquis.

35. In justifiable reliance upon Defendants' misrepresentations regarding the grease interceptor and Marquis advertising, Plaintiff was induced to enter into the Lease and to do other things, including engaging a contractor and purchasing items needed to open a restaurant in the unit leased from Jurupa.

36. As a proximate result of Defendants' misrepresentations regarding the grease interceptor, the Gibsons have been damaged in an amount of approximately $13,000 in out-of-pocket cost for installing the grease interceptor.

37. As a proximate result of Defendants' misrepresentation regarding Marquis advertising entitlements Mr. G's Restaurant has suffered a substantial loss of profit and business opportunities.

38. In addition, the Gibsons have suffered emotionally as a result of JVS's failures and omissions. The Gibson's emotional suffering includes but is not limited to the following:

FOURTH AMENDED COMPLAINT

1    sleeplessness and insomnia, headaches, and constant anxiety.

2        39. In making the misrepresentations, Defendants' actions were willful, oppressive,

3    fraudulent and malicious. The Gibsons are therefore entitled to recover punitive or exemplary

4    damages from Defendants.

### FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation)

### (Against All Defendants)

9        40. The Gibsons reallege and incorporate by reference, paragraphs 1 through 9, inclusive

10    of the General Allegations, and paragraphs 10 through 19, of the First Cause of Action, and

11    paragraphs 20 through 38, inclusive, of the Third Cause of Action, as if set forth in full.

12        41. When Defendants made the misrepresentation, they had no reasonable ground for

13    believing the representation was true.

### FIFTH CAUSE OF ACTION

### (Breach of Oral/Implied-Fact-Contract)

### (Against All Defendants)

18        42. Plaintiff restates and incorporates by reference each and every allegation contained in

19    paragraphs 1 through 9, inclusive of general allegation, and paragraphs 10 through 41, as though

20    fully set forth herein.

21        43. Pursuant to verbal representations of JVS's Site manager regarding Marquis-based

22    Advertising,, JVS entered into a contract with Mr. Gibson to lease space for his restaurant and to

23    advertise his restaurant at the Jurupa Valley Spectrum.

24        44. Mr. Gibson substantially performed his duties under the contract by paying his rent in

25    a timely manner and maintaining his leased space and its surrounding common areas in good,

26    working condition.

27        45. The defendants breached the Contract by refusing to specifically perform on the terms

28    of the oral and implied in fact representation to permit Mr. Gibson to advertise Mr. G's restaurant

1    on the Marquis.

2        46. The defendants have damaged Mr. Gibson as a result of said breach and are liable to

3    him for actual and compensatory damages in an amount to be proven at trial.

4

5    ## SIXTH CAUSE OF ACTION

6    **(Racial Discrimination in Violation of the Unruh Civil Rights Act and the Equal Protection**

7    **Clause of the U.S. Constitution)**

8    **(Against All Defendants)**

9        47. Plaintiff restates and incorporates by this reference each and every allegation

10    contained in the paragraphs of this Complaint as though set forth herein.

11        48. Mr. Gibson is the only African American restaurateur in the JVS complex. All of the

12    non-African American owners  restaurants in the facility are permitted to advertise on the

13    Marquis.

14        49. Moreover, the non-African-American owned fast-food restaurants and chain-store

15    that do not advertise on the Marquis are permitted to display advertisements on their store front

16    windowns.  However, when Mr. G.'s Restaurant attempted to mount a store front advertisement

17    on the restaurant windows the advertisement was promptly removed by JVS managers.

18    Mr. G's is the only JVS lessee, restaurant or otherwise, to be **targeted** and chastised by  JVS

19    management for utilizing store-front advertisements.

20        50. JVS does not have any African American employees in upper level management

21    positions.  Indeed, Plaintiffs are informed and believe that JVS does not hire African Americans,

22    with the exception of laborers who perform maintenance and security services.

23        51. JVS refused to allow Plaintiffs to advertise Mr. G's restaurant on the Marquis, despite

24    an agreement to allow such activity and Mr. Gibson's repeated requests to mount such

25    advertisement.

26        52. Defendants excludes Mr. Gibson from access to Marquis advertising because he is

27    African American.

28        53. As a direct and proximate result of the conduct perpetrated against complainant by

1    and prospective customers and prevent complainant from benefitting economically from those

2    relationships.

3        61. Defendants' acts and omissions constituted wrongful conduct in violation of the Unruh

4    Civil Rights Act and the Equal Protection Clause of the U.S. Constitution.

5        62. Defendants' acts and omissions constituted wrongful conduct in violation of

6    California's Unfair Competition Law and public policies designed to prevent discriminatory

7    restraints on competition on the basis of race as stated in Business and Professions Code

8    sections17000 and 17070.

9        63. Defendants' acts and omissions constituted wrongful conduct in violation of the

10    judicial doctrine and public policies favoring access to the courts and freedom to seek legal

11    redress without reprisals. (*See e.g..S. P. Growers Asso. v. Rodriguez* (1976)17 Cal.3d 719;

12    *Pacific Gas and Electric Co. v. Bear Stearns* (1990) 50 Cal.3d 1118, 1131-1133.)

13        64. Plaintiffs' customers, including but not limited to local residents John Thompson,

14    Sharon Guillary, Ken Leonzrd, Merced Matthew, Sharon Ratlift and Thomas Randolf told

15    plaintiffs that they would have patronized Mr. G.'s restaurant sooner and with greater regularity

16    had he advertised the store on the JVS Marquis, which they frequently passed.

17        65. As a direct and proximate result of the conduct perpetrated against Plaintiffs by

18    Defendants, and/or its agents/employees, Plaintiff has suffered and will continue to suffer

19    physical and mental distress, lack of professional and business opportunities and advancement,

20    and other damages in an amount to be proven at trial.

21

22        WHEREFORE, the Gibsons pray for judgment as follows:

23        1.    For actual and compensatory damages in an amount according to proof at trial;

24        2.    For a declaration that the Gibsons are entitled to full reimbursement from

25    defendants under the Lease for all expenses incurred to install a "grease interceptor" as required

26    by the Jurupa Community Services District;

27        3.    For  punitive damages in an amount not exceeding the jurisdictional limit of this

28    Court;

1

4.    For pre-judgment interest on all actual and compensatory damages; and

2

5.    For costs of suit incurred herein;

3

6.    For attorneys' fees according to proof and as provided by the Lease or by law; and

4

7.    For such other relief as the Court deems just and proper.

5

6    Dated:  April 30, 2010

7

Donald Ray Gibson, In Pro Per

8

9

Sandra Mae Gibson, In ProPer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF RIVERSIDE

I am employed in the County of Riverside, State of California. My business address is 11876 Abington Street, Riverside, California 92503.

On April 30, 2010, I served the following document(s) described as PLAINTIFFS' FOURTH AMENDED COMPLAINT on the interested parties in this action as follows:

Andrew V. Jablon, Esq.
RESCH POLSTER & BERGER LLP
9200 Sunset Boulevard, Ninth Floor
Los Angeles, California 90069-3604

**BY OVERNIGHT DELIVERY:** I enclosed said document(s) in an envelope or package provided by the overnight service carrier and addressed to the persons at the addresses listed in the Service List. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight service carrier or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 30, 2010, at Riverside, California.

_____
                              Tony Gibson

**DONALD GIBSON**
**8022 Limonite Ave. # 101**
**Riverside, CA 92509**
**(714)743-9366**

**In Pro Per**



FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

FEB 18 2010

R. Devries

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF RIVERSIDE

### CIVIL DIVISION

| | |
|---|---|
| **JURUPA VALLEY SPECTRUM-PHASE, 1 LLC. A does 1 DOES through 10, inclusive.**<br><br>              **Plaintiffs,**<br>     **V.**<br><br>**DONALD RAY GIBSON an individual**<br>**Sandra Mae Gibson, an individual**<br><br>              **Defendants.** | **Case No.  MVC10000182**<br><br>**DEFENDANTS REPLY TO PLAINTIFFS MEMORANDUM OR POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE SUMMARY ADJUDICATION**<br><br>**Action Filed    January 12,2010**<br>**Trial Date      None Set**<br>**Hearing**<br>**Date: 2/19/10**<br>**Dept. 5** |

Defendants Donald Ray Gibson doing business as Mr. G's Restaurant, Inc. ("The Gibson's"

and /or "Defendants") Defendants did not received the plaintiffs reply until two days before

the hearing February 17, 2010.

### THE PLAINTIFFS STATED THE THREE-DAY NOTICE WAS PROPER

The estimate amount of rent that Jurupa Valley Spectrum is claiming **is not a**

**reasonable claim,** per *1161.ḟ California Code of Civil Procedure Section.* **The claim**

**must be reasonable.** Jurupa Valley Spectrum returned August 2009 rent in the mail.  The

*Exhibit #2*

Gibsons put a stop payment on September 2009 rent check because Jurupa Valley Spectrum

said they never received the check. All my checks is mailed out by Wells Fargo Bank.

### The Plaintiffs Stated Retaliatory eviction is not a valid affirmative defense

The Plaintiffs stated that Retaliatory eviction is not a valid affirmative defense.

Retaliatory and Discrimination is against the law any the time. Jurupa Valley Spectrum has

broken the Law. Jurupa Valley Spectrum has Retaliated against the Gibsons because; The

Gibsons filed a court case against Jurupa Valley Spectrum. The Gibson's filed the Retaliation

Case **before** Jurupa Valley filed their Unlawful Detainer Case. Jurupa Valley Spectrum

caused The Gibson to get behind on their rent.  Jurupa Valley Spectrum had **obstruct** the

Gibson's business by keeping The Gibson from making money at Mr. G's Restaurant. Jurupa

Valley Spectrum wants to get rid of the Gibson's from Jurupa Valley Spectrum Center. Jurupa

Valley Spectrum has retaliated against The Gibson's because The Gibson's filed a Breach of

Contract, Fraud and Misrepresentation charges against Jurupa Valley Spectrum the case is

pending in court. Case # 502124. In 2008 The Gibsons put advertisement on Mr. G's

Restaurant windows approximately three weeks later about 3:00 am, Jurupa Valley Spectrum

removed the advertisement off Mr. G's Restaurant Windows without advising The Gibsons.

Jurupa Valley Spectrum did not remove any other Businesses window advertisement, just Mr.

G's Restaurant window only. **This is Retaliation and Discrimination.** *Unruh Civil rights*

*Act 51 through 53.3, 42 U.S.C 122203 a, 28 C.F.R. 35.134 a & 1, 3 and 4,*

*28 C.F.R. 36206 a, 29 C.F.R. 1630.12 a*

### SMALL CLAIMS COURT CASE, THREAT / BLACKMAIL

Jurupa Valley Spectrum have also Retaliated against The Gibsons because The Gibsons

filed a Small Claims Court Case #193200 against Jurupa Valley Spectrum. Before The

Gibsons won the Small Claims Case Jurupa Valley threatened / Blackmail the Gibsons by

giving the Gibsons a letter to sign stating if you (The Gibsons)" do not agree to the above

terms, you will not be permitted to advertise your business at any time on the Monument

sign"

Jurupa Valley Spectrum know if they (Jurupa Valley Spectrum) can keep Mr. G's Restaurant

from doing any Advertisement the Gibson **can't** make any money to pay their bills.

Advertisement is very important to any business. **This is Retaliation and Discrimination**.

***Unruh Civil Rights Act 51 through 53.3, 42 U.S.C. 12203 a, 28 C.F.R. 35134 a 1, 3 and 4***

***28 C.F.R. 36206 a, 29 C.F.R. 1630.12 a.*** *Exhibit #1 Copy of Jurupa letter.*

## REMOVAL BANNER FROM MARQUIS

In January 2008 Jurupa Valley Spectrum removed Mr. G's Restaurant Banner / Sign off the

Marquis (memorandum.) the Marquis is location on Limonite Ave. in the center of the mall.

my Jurupa Valley Spectrum removing The Gibsons banner this is keeping Mr. G's

Restaurant from doing any advertising on the marquis. The Gibson have not done any

advertising on the marquis for **approximately two years and six months**

but other business and Restaurants had the opportunity to use the marquee even a newer

businesses in Jurupa Valley Spectrum Center use the marquis. Two new businesses came in

Jurupa Valley Spectrum after Mr. G's Restaurant and there businesses was put up on the

Marquis. Jurupa Valley Spectrum would not let Mr. G's Restaurant put up a sign even thou

Jurupa Valley Spectrum had one or two **open spaces** for two years. Jurupa Valley Spectrum

let other businesses advertise but won't let the one only black business in Jurupa Valley

Spectrum do any advertising.  Jurupa Valley Spectrum **obstructed** The Gibson from making

money. **This is Retaliation and Discrimination.** ***Unruh Civil "Rights Act 51 through 53.3,***

***42 U.S.C. 12203 a, 28 C.F.R. 35134 a. 1, 3 and 4,  28 C.F.R. 36306 a, 29 C.F.R. 1630.12 a.***

## REPAIR OF THE ROOF

The Gibson have been asking Jurupa Valley Spectrum to **repair the roof** in the kitchen

area for **two years.** Jurupa Valley Spectrum per the lease section 7.1 is responsible for fixing

the roof. Jurupa **refused to repair the roof**. Water has been leaking from the roof for two

years. The Gibsons have called and emailed Jurupa Valley Spectrum and advised them that

the ceiling is falling down in the kitchen because of the leaking water that is

coming in from the leaking roof. On February 10, 2010 by order of the County of Riverside

Department of Environmental Health per California Health and Safety Code Section

113960, Inspector A. Islas **closed** Mr. G's Restaurant down. This is Retaliation and

discrimination, because Jurupa Valley refused fix the roof for two years *Unruh Civil Rights*

*Act 51 through 53.3, 42 U.S.C. 12203 a, 28 C.F.R. 35134 a. 1.3 and 4, 28 C.F.R. 36206 a,*

*And  29 C.F.R. 1630.12 a. Exhibit # 2 Facility Closed Sign from County Riverside*

*Department of Environmental Health. Exhibit # 3 Declaration from Sharon Ratlift*

*Exhibit # 4 Declaration from Arturo Gonzalez*


## REMOVAL OF SIGN FROM EDWARDS CINEMA MARQUIS

In November 2009 for no reason Jurupa Valley Spectrum called there Security people and

told them to remove The Gibsons banner off of Edwards Cinema Marquee. The Gibsons and

the manager of Edwards Cinema makes a deal for the Gibsons to place a sign on Edwards

Cinema marquee. In return Mr. G's Restaurant was going to place a sign from Edward

Cinema inside Mr. G's Restaurant. **This is Retaliation and Discrimination.**

*Unruh Civil Right Act 51 through 53.1, 42 U.S.A. 12203 a, 28 C.F.R. 35134 A & 1,2 and 3*

## THE PAYMENT OF RENT

The Gibsons is claiming and have always claimed that Jurupa Valley Spectrum owes The

Gibson's money for installing a Grease Interceptor. The Gibson is also stating that they **paid August and September 2009 Rent.**

## CONCLUSION

Jurupa Valley Spectrum feels that it is ok to Retaliation and Discriminate. Jurupa feel because Commercial landlord Laws do not talk about landlord Retaliation and Discriminate it is ok for Jurupa Valley Spectrum to Retaliation and Discriminate. Jurupa Valley Spectrum do not understand that it is against the law to Retaliation and Discriminate at any time. Jurupa Valley Spectrum needs a wake up call. This is the 20 Century not 1946. Jurupa Valley Spectrum charge me for services that I do not receive. I do not receive the fair and good Services other tenants in Jurupa Valley Spectrum receive. Jurupa Valley Spectrum has so Intentionally stop my business. I am asking you to deny Jurupa Valley Spectrum Motion for Summary Judgment  or, in the alternative Summary Adjudication.

February 18, 2009

Respectfully submitted
DONALD R. GIBSON

EXHIBIT #1

ARCHITECTURAL VENTURES

September 13, 2008

Mr. G's BBQ
Donald Gibson and Sandra Gibson
11876 Abington Street
Riverside, CA 92503

RE: Small Claims Court Case #RIS1192200

On August 18, 2008 a case was filed with the Superior Court of California, County of Riverside, against Jurupa Valley Spectrum. Your claim is that we owe you $438.00 for the removal of your window advertising on July 19, 2008.

By signing this document, you are hereby withdrawing your case against Jurupa Valley Spectrum. In return, we will allow you to place a banner on the center's monument sign. The location and length of time your banner will appear on the monument sign is at the landlord's discretion, but will remain for at least 4 weeks.

Once the landlord receives formal documentation from the Superior Court of California, County of Riverside, withdrawing your lawsuit, and upon landlord's approval of your banner, only then will you be allowed to display your banner on the monument sign. If you do not agree to the above terms, you will not be permitted to advertise your business at any time on the monument sign.

You signature below indicates your acceptance to the terms stated above.

_____
Donald Raye Gibson
Mr. G's BBQ

ExHiBiT 2



Water Damage Kitchen Ceiling

# FACILITY CLOSED

## BY ORDER OF THE COUNTY OF RIVERSIDE
## DEPARTMENT OF ENVIRONMENTAL HEALTH

### PER CALIFORNIA HEALTH AND SAFETY CODE
### SECTION 113960

DATE CLOSED: _2-10-10_    INSPECTOR: _A. Islas_

Property of the County of Riverside
For Questions Please Call: _358-5172_

RIVERSIDE COUNTY COMMUNITY HEALTH AGENCY
DEPARTMENT OF ENVIRONMENTAL HEALTH

Exhibit 3

1   **DONALD GIBSON**
2   *8022 Limonite Ave. # 101*
    *Riverside, CA 92509*
3   *(714)743-9366*

4
    In Pro Per
5

6

7

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                       COUNTY OF RIVERSIDE

11                         CIVIL DIVISION

12  **JURUPA VALLEY SPECTRUM-**
    **PHASE, 1 LLC. A does 1 DOES through**           Case No.  MVC10000182
13  **10, inclusive.**
                                          DECLARATION OF SHARON RATLIFT
14
                    **Plaintiffs,**
15      V.

16  **DONALD RAY GIBSON an individual**
    **Sandra Mae Gibson, an individual**
17

18                 **Defendants.**

19

20         I am an employee of Mr. G's Restaurant Inc. I have worked for Mr. G's Restaurant for

21  approximately 1 year and 8 months. If call on I can and will testify that I observe for the last

22  year and eight months water coming down from the roof all over the kitchen area of Mr. G's

23  Restaurant. I also observe water in the lights socket and the ceiling coming down in the

24  kitchen area.

25

26         I declare under penalty of perjury under the laws of the State of California that the

27  foregoing is true and correct.

28

1

2

3

4
Sharon Ratlift

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 4

1

**DONALD GIBSON**
2 **8022 Limonite Ave. # 101**
**Riverside, CA 92509**
3 **(714)743-9366**

4

**In Pro Per**
5

6

7

8

9                              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                                          **COUNTY OF RIVERSIDE**

11                                             **CIVIL DIVISION**

12 **JURUPA VALLEY SPECTRUM-**          **Case No.  MVC10000182**
**PHASE, 1 LLC. A does 1 DOES through**
13 **10, inclusive.**
                                      **DECLARATION OF ARTURO GONZALEZ**
14                    **Plaintiffs,**

15        **V.**

16 **DONALD RAY GIBSON an individual**
**Sandra Mae Gibson, an individual**
17

18                    **Defendants.**

19

20        I am an employee of Mr. G's Restaurant Inc. I have worked for Mr. G's Restaurant for

21 approximately 2 years. If call on I can and will testify that I observe for the last year and nine

22 months water coming down from the roof all over the kitchen area of Mr. G's Restaurant. I

23 also observe water in the light socket and the ceiling falling down in the kitchen area.

24

25

26        I declare under penalty of perjury under the laws of the State of California that the

27 foregoing is true and correct.

28

1

2

3      2/12/10 /

4      Arturo Gonzalez

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This is my unopened rent check for September 2009.  This check was mailed back to me. Somebody stamped payment enclosed on the envelopes.

Exhibit 3

Exhibit 3

DOCUMENT CONTAINS COLORED BACKGROUND ON WHITE PAPER. 'VOID' FEATURE, SIMULATED WATERMARK (REVERSE SIDE) MICRO-PRINT BORDER.

PLEASE POST THIS PAYMENT FOR OUR MUTUAL CUSTOMER

| Account:  8022 LIMONITE AVE  101 | | $3,630.80 |
|---|---|---|

4288/1210

0000005610

Please Direct Any Questions
To: (800) 278-6302
OUR OPERATIONS DEPARTMENT

GIBSON
11876 ABINGTON ST.
RIVERSIDE, CA 92503-5992

WELLS FARGO BANK NA

**August 11, 2009**

MEMO: Rent for August 2009

Pay **THREE THOUSAND SIX HUNDRED THIRTY AND 80/100** --------------------------------------

**DOLLARS**

$ **\*\*\*\*\*3,630.80**

To
The
Order
Of

JURUPA VALLEY SPECRUM
9200 W SUNSET BLVD
LOS ANGELES, CA 90069-3502

Void After  180 DAYS.
*Signature On File*
This check has been authorized
by your depositor

WARNING: THIS BORDER CONTAINS MICRO-TYPE WHICH WILL NOT REPRODUCE ON A COPIER.

⑈005610⑈ ⑆121042882⑆ 3211547659⑈

---

Presorted
First-Class Mail
U.S. Postage Paid
CHECKFREE

**PAYMENT ENCLOSED** ❓

NIXIE        900   DE 1        02 08/17/09
RETURN  TO  SENDER
NOT DELIVERABLE  AS ADDRESSED
UNABLE  TO  FORWARD
BC: 92503599276      \*0962-00507-17-30

EAE-GP1      90063
92503Ⴟ5992

**WELLS FARGO**

Wells Fargo Phone Bank℠
P.O. Box 6070
Rosemead, CA 91770
1-800-869-3557

September 30, 2009

SANDRA M GIBSON
DBA MR G'S RESTAURANT
11876 ABINGTON ST
RIVERSIDE, CA 92503-5992

RE: Stop payment confirmation

Dear SANDRA M GIBSON:

Thank you for contacting Wells Fargo. On 09/30/2009 we processed your request to stop payment on the check or preauthorized electronic transfer listed below.

| | |
|---|---|
| Account number: | XXXXXX7659 |
| Amount: | $3,700.00 |
| Payee: | jurupa valley spectrum |
| Check number: | 5919 |
| Date of check or electronic transfer: | 08/28/2009 |

If any of the information above is not correct, please notify us immediately at 1-800-TO-WELLS (1-800-869-3557). Phone Bankers are available to assist you 24 hours a day, 7 days a week.

Your account may be assessed a Stop Payment fee. For additional information about this stop payment, please see the reverse side of this letter or refer to your Consumer Account Fee and Information Schedule.

Your stop payment order will remain in effect until 03/31/2010, and must be renewed every six months after this date to remain in effect. If at the end of this period you wish to renew this stop payment, please contact us at the number listed above. A fee may be charged for each stop payment renewal. If a stop payment request is not renewed and the item is then presented for payment, the item may be paid and charged to your account.

If you have any questions, please call us at the number listed above. Thank you for choosing Wells Fargo. We appreciate your business.

Wells Fargo Phone Bank

Note: The Supplemental Consumer Account Agreement on the reverse side of this letter describes additional stop payment information. Please retain it for your records.

AUGUST PAYMENT    Exhibit 3

PBL-100109-1

XQ0037E
A927367965

Wells Fargo Business Online®

## Message Detail

< Previous  |  Next >

| | |
|---|---|
| Subject | Account questions or requests (KMM887845415977L0KM) |
| Received | February 18, 2010 |
| From | Customer Service |
| | Contact Us |

Dear Donald Gibson:

Thank you for writing us regarding your payment. I have reviewed the payment details and our records show that it was mailed out as a paper check on 08/28/09. The mailing address the check was sent to is as follows:

9200 Sunset Blvd.
9th Floor
Los Angeles, Ca 90069

I have also forwarded the information you provided regarding the payment to Jurupa Valley Spectrum to our Bill Pay research staff who are working to resolve this matter quickly. You will receive an email on the status of your inquiry within 10 business days.

The email will be sent through your Quicken software. Email sent through this software is secure, so we use it to provide more specific account and payment information than we can in regular email.

If you have additional information or questions on this matter, call us any time at 1-800-956-4442 for Money/Quicken, or 1-877-273-1106 for QuickBooks. Please mention the Case Number 40800794 when you write or call.

Sincerely,
Eric Stiemerling
Wells Fargo Online Customer Service

Wells Fargo is dedicated to protecting your information. To learn about our security measures and what we do to protect your accounts online, go to wellsfargo.com/privacy_security/fraud/

If you have another question about this subject, please click the Reply button at the bottom of the page. To ask a new question, click the Contact Us link at the top of the page.

ORIGINAL MESSAGE:

Check # 5919 I pay via Quicken to Jurupa Valley Spectrum For $3700.00 on 8/28/2009. Jurup said that they never receive that check. I place a stop payment on the check 09/30/09.

need to know the ADDRESS the check was mail to and the DATE the check was MAILED out to Jurupa Valley Spectrum.

⌂ Equal Housing Lender
© 1995 – 2010 Wells Fargo. All rights reserved.

4/10/2010

Exhibit 3

EAST SIDE





EXHIBIT 4



Exhibit 4   East Side



THIS IS WHERE THE WATER WAS COMING IN

Exhibit 4



10.00AM –

# COUNTY OF RIVERSIDE • COMMUNITY HEALTH AGENCY
# DEPARTMENT OF ENVIRONMENTAL HEALTH

SUPPLEMENTAL REPORT TO SAN. FORM # __pg 1 of 2__    DATE __2-10-10__

SUBJECT __Mr Gs Restaurant__    PERMIT NO. __PR 6640__

ADDRESS __8022 Limonite Ave #101 Riverside__    DISTRICT __2__

REMARKS: __04, 458__    INSPECTOR __Antonio Islas__
__(951) 358-5172__

Photos taken this date.

Initial complaint inspection CO 32724 alleging "leak in kitchen ceiling and smells like mold".

An inspection this date revealed extensive ceiling and water damage over the reach-in refrigerator and nearby prep table. Observed insulation exposed and water dripping from the ceiling into the kitchen. Observed water damage, insulation exposed, and a ceiling panel missing over the prep refrigerator and nearby steam table. The light fixture in the middle of the hood canopy was removed because it was filling up with water.

Met with the owner and cook this date at the facility. Instructed them to immediately discontinue any food preparation/cooking. The owner agreed

RECEIVED BY: _____

DEH-SAN-118 (Rev 8/02)

EXHIBIT # 5

# COUNTY OF RIVERSIDE • COMMUNITY HEALTH AGENCY
## DEPARTMENT OF ENVIRONMENTAL HEALTH

SUPPLEMENTAL REPORT TO SAN. FORM # ___ pg 2 of 2

SUBJECT ___ Mr. G's Restaurant                    DATE ___ 2-10-10

ADDRESS ___ 8022 Limonite Ave #101 Riverside    PERMIT NO. ___ PR 6640

DISTRICT ___ 2

REMARKS:                    INSPECTOR ___ Antonio Illas

to voluntarily close this date. "A" placard removed and closure sign posted. The facility was closed this date due to the ceiling water damage and potential for food contamination as a result.

The facility was not graded this date. Past inspections show grades of 12-??-09 97A, 3-24-09 94A, and 11-18-08 95A. This facility has maintained above a 94A and passed inspections.

The closure is as a result of the ceiling water damage only. The ceiling must be properly repaired and sealed before this Agency can reopen the facility. Provide this Agency with paperwork showing the work has been completed. Once the work has been completed to repair the ceiling and eliminate the water leakage contact this Agency for a reinspection in order to reopen.

RECEIVED BY: X ___

H-SAN-118 (Rev)

Distribution: WHITE—Office; CANARY—Owner; PINK—

Subj:     **RE: (no subject)**
Date:     9/30/2008 2:09:34 PM Pacific Daylight Time
From:     jt@avredev.com
To:       Donaldraygibson@aol.com

Donald,

I believe we have addressed this issue already early this year. It was determined that the place where your roof leaks is a result of work you had done when you moved in by your contractor. I would suggest contacting your contractor and having him fix your roof. He obviously did not seal the area properly and that is why it leaks. This is not the responsibility of the landlord. The leak is related work done by your contractor.

-Jeanette

**From:** Donaldraygibson@aol.com [mailto:Donaldraygibson@aol.com]
**Sent:** Tuesday, September 30, 2008 11:53 AM
**To:** Jt@avredev.com
**Subject:** (no subject)

I want to advise you that my roof in leaking water when it rain. If it do not get fix the roof could get weak and **fall** in. I do not have the money to get the roof fix.

*Donald Gibson*

*Mr. G's BBQ & Southern Foods*
*8022 Limonite Ave*
*Riverside, CA 92509*
*951-681-9366*

Looking for simple solutions to your real-life financial challenges? Check out WalletPop for the latest news and information, tips and calculators.

Exhibit 6

Subj:       **Leaking Roof**
Date:       9/29/2008 9:51:56 PM Pacific Daylight Time
From:       Donaldraygibson
To:         Jt@avredev.com

I want to advise you that my roof in leaking water when it rain. If it do not get fix the roof could get weak and full in. I do not have the money to get the roof fix.

*Donald Gibson*

*Mr. G's BBQ & Southern Foods*
*8022 Limonite Ave*
*Riverside, CA 92509*
*951-681-9366*

Exhibit b

**Nationwide Insurance**

**Allied Insurance**

**Nationwide Agribusiness**

**Titan Insurance**

*On Your Side*    **Victoria Insurance**

One Nationwide Gateway, Dept 5577, Des Moines, IA 50391-5577

March 3, 2010

DONALD GIBSON - DBA
MR. G'S RESTAURANT
8022 LIMONITE AVE STE 101
RIVERSIDE, CA 92509 6117

Claim No.:   72 04 PE 166063 020310 51
Policy No.:  ACP BPF 7804307132 0
Date of Loss:  February 3, 2010
Loss Location: 8022 Limonite Ave., Suite 101, Riverside, CA
Type of Loss:  Roof Leak

Dear Donald Gibson:

Our office is in receipt of a loss notice submitted to AMCO Insurance Company, concerning the above-referenced loss.  Upon a careful review of the facts of your loss and policy provisions, we regret we must inform you there is no coverage for your loss.

You have presented a claim for a roof leak that allowed rain water to enter the structure located at the loss location noted above.  The water caused damage to the interior of the building. On February 24th we spoke with you and took your recorded statement and learned that during the recent heavy rains the roof leaked and caused damage. The ceiling tile fell and water was leaking onto the equipment. You advised that the Health Department shut you down due to unhealthy conditions.  You also stated that you have notified the landlord of the leaking roof and they have refused to make repairs. They state that the leaking roof was caused by your installation of the vents and a swamp cooler. During our statement we advised you there must be a covered cause of loss that damages the roof or exterior of the building that allows water to enter in order for the interior damage to be covered.

We inspected the damages on February 24, 2010 in your presence and were able to get on the roof to perform some visual inspections. Below are some of the conclusions I was able to observe.

- There was no visible damage to the roof or related components as a result of storm-related activities or impact from a foreign object.
- Based on our visual inspection, we have determined that the interior damage is due to one or more of the following deficiencies that promote and/or become overburdened with moisture when saturation develops:

  1. Age-related openings and/or delamination developing at isolated through-wall scupper locations.
  2. Age-related splits and cracks in the mastic coping and roof transition seals.
  3. Pooling water in the area around the drain that does not allow for proper drainage.
  4. Granules missing from roofing surfaces show signs of wear and tear and/or deterioration.
  5. There is no evidence that the roof is leaking around the equipment installed by the insured.

Accumulations of debris and/or restricted drains can allow moisture to back up on the roof promoting standing water and/or exacerbate overburdening conditions.

Exhibit 7

As we discussed, there must be a covered cause of loss that damages the roof or exterior of the building that allows water to enter in order for the interior damage to be covered. The above causes are wear, tear, deterioration and faulty, inadequate or defective materials, maintenance et al. Therefore, we regret we are unable to extend coverage for your claim.

At this time, we would like to review with you your insurance contract with this company, specifically your Premier Businessowners Property Coverage Form PB 00 02, edition (01-08), pages 2, 3, & 4 of 34, where it states in part:

## A. COVERAGES

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 3. COVERED CAUSES OF LOSS

This coverage Form insures against Risks of Direct Physical Loss unless the loss is:

a. Excluded in Section B. EXCLUSIONS;

b. Limited in Paragraph A.4. LIMITATIONS in this section; or

c. Limited or excluded in Section E. PROPERTY LOSS CONDITIONS or Section G. PROPERTY GENERAL CONDITIONS;

that follow.

### 4. LIMITATIONS

a. We will not pay for loss of or damage to:

4) The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

a) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

b) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

Please now refer to pages 17 through 20 of 34, where it states in part:

## B. EXCLUSIONS

2. We will not pay for loss or damage caused by or resulting from any of the following:

j. Other Types of Loss

1) Wear and tear;

2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

3. We will not pay for loss or damage caused by or resulting from any of the following B.3.a. through B.3.d. But if an excluded cause of loss that is listed in B.3.a. through B.3.d. results in

a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

c.   **Negligent Work**

Faulty, inadequate or defective:

1)   Planning, zoning, development, surveying, siting;

2)   Design, specifications, workmanship, work methods, repair, construction, renovation, remodeling, grading, compaction, failure to protect the property;

3)   Materials used in repair, construction, renovation or remodeling; or

4)   Maintenance;

of part or all of any property on or off the described premises.

We regret that we will be unable to provide coverage for your loss, however should any additional information become available which you feel may alter our decision, please advised our office at your earliest convenience. The above-stated policy provisions are applicable based upon our investigation of your loss. However if future evidence develops AMCO Insurance Company expressly reserves all rights and defenses which are currently available to it with reference to policy number ACP BPF 78043071320 and the company does not waive any rights or defenses which it now has or which may become known to it in the future.

Should you believe this claim has been wrongfully denied or rejected, please feel free to contact the California Department of Insurance, Attn: Claim Service Bureau, 300 South Spring Street, Los Angeles, CA 90013, or you may contact them direct at (800) 927-4357, or for out of state callers, please contact them at (213) 897-8921.

We would like to take this opportunity to advise you of the suit provision of your policy, and specifically pages 22 and 23, of 34, where it states in part:

E.   **PROPERTY LOSS CONDITIONS**

4.   **Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

a.   There has been full compliance with all of the terms of this insurance; and

b.   The action is brought within 1 year after the date on which the direct physical loss or damage occurred.

Based upon this Condition, and the time allowed to investigate your claim, you would have until February 14, 2011 to bring action or submit new information to be reviewed. Any claims made or paperwork received after this date may be denied.

Should you have any questions or concerns regarding this matter please do not hesitate to contact me at (661)802-4836. Thank you for your cooperation.

Sincerely,


Ramon C. Jones, Jr.
Commercial Property Specialist
AMCO Insurance Company

Exhibit 7

7.1    **Tenant's Obligations**. Tenant at its sole cost and expense shall keep the Premises and every part thereof including without limitation all Alterations (other than the roof, the roof structure and supports, the foundation and structural supports, the load bearing and exterior walls, the gutters and downspouts, and the plumbing and electrical service to the Premises) in good order, condition and repair (reasonable wear and tear excepted), whether or not the need for such repairs occurs as a result of Tenant's use, any prior use, the elements, or the age of such portion of the Premises. The foregoing responsibilities shall include, without limitation, (i) the heating, air conditioning, ventilating, electrical, plumbing (including the Premises Meter, if any), life safety and lighting facilities and equipment inside the Premises from time to time servicing the Premises, (ii) all signage (whether inside, on, or outside the Premises) identifying Tenant and/or Tenant's business, (iii) any heating, air conditioning and ventilating equipment, air handlers and utility meters from time to time exclusively servicing the Premises even if located on or outside the Premises, and (iv) all fixtures, interior walls, floors, ceilings, windows, doors, plate glass and sky lights located within the Premises or mounted in the exterior walls of the Premises.

7.2    **Default by Tenant**. If Tenant fails to perform Tenant's obligations under this Article 7, then Landlord may, at its option (but shall not be required to and without limitation insofar as Landlord's other remedies under this Lease, at law or in equity may be concerned), enter upon the Premises after reasonable notice to Tenant (except that no notice shall be required in the event of an emergency, and this Paragraph 7.2 shall not require the giving of any additional notice if notice of such failure has already been given pursuant to Paragraph 19.1), and provided that Tenant has not theretofore cured such failure, put the same in good order, condition and repair, and the cost thereof, with an overhead surcharge of 10% of such cost, together with interest at the Interest Rate, shall become due and payable, as Rent, to Landlord together with Tenant's next installment of Minimum Rent coming due after Landlord delivers to Tenant an invoice therefor, together with back up documentation reasonably satisfactory to Tenant.

7.3    **Landlord's Obligations**. Landlord agrees to maintain and repair Phase One and its Common Areas (including, without limitation, any heating, ventilation and air conditioning system for the Common Areas, the load bearing and exterior walls in Phase One, the other structural elements in Phase One, any gutters and downspouts in Phase One, plumbing, electrical and any other utility service in Phase One which is delivered up to the Premises and otherwise in Phase One (other than within the Premises), and any vertical transportation systems in Phase One) in a first class manner so as to keep them in good order, clean condition and repair and in compliance with all applicable legal requirements (including replacement, upgrading or the installation of new improvements when required), but Landlord shall not be liable to Tenant for any damage caused by the same being or becoming out of repair or in non-compliance until it has had a reasonable opportunity to have the same repaired after being notified of such need by Tenant. The cost of any such repair or maintenance shall constitute an item of "expense" if and to the extent so provided in Article 15. Tenant expressly waives the benefit of any statute now or hereafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense, or to terminate this Lease because of Landlord's failure to keep the Premises in good order, condition and repair. Tenant waives the provisions of Civil Code 1932, 1933, 1941 and 1942 and all similar, successor or related provisions of law.

8.   **Alterations and Improvements**.

8.1    **Conditions**. All alterations, additions and improvements to be made by Tenant in, on, to or about the Premises, including without limitation, Tenant's Work, are referred to, collectively, as "**Alterations**." Tenant shall not make any structural Alterations, any Alterations in the storefront or the exterior of the Premises, any Alterations visible from outside the Premises or any Alterations that Landlord, in good faith, believes may adversely affect the value of the Premises or Phase One, without, in each instance, first obtaining the consent of Landlord, which may be withheld in Landlord's sole discretion; provided, however, that Landlord shall not unreasonably withhold, condition or delay its consent to Tenant's Work, which consent shall, in any event, be consistent with Paragraph 3. Tenant shall not make any Alterations affecting any of the systems for Phase One or the Project or any Alterations, or any related series thereof, costing more than $2,500 without, in each instance, first obtaining the consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed. Tenant shall, however, be permitted to make interior non-structural Alterations, or a related series thereof, costing less than $2,500, without Landlord's prior consent; provided, however, that such Alterations do not affect any of the systems of Phase One (any such Alteration, or series of related

7.3   **Landlord's Obligations**. Landlord agrees to maintain and repair Phase One and its Common Areas including, without limitation, any heating, ventilation and air conditioning system for the Common Areas, the load bearing and exterior walls in Phase One, the other structural elements in Phase One, any gutters and downspouts in Phase One, plumbing, electrical and any other utility service in Phase One which is delivered up to the Premises and otherwise in Phase One (other than within the Premises), and any vertical transportation systems in Phase One) in a first class manner so as to keep them in good order, clean condition and repair and in compliance with all applicable legal requirements (including replacement, upgrading or the installation of new improvements when required), but Landlord shall not be liable to Tenant for any damage caused by the same being or becoming out of repair or in non-compliance until it has had a reasonable opportunity to have the same repaired after being notified of such need by Tenant. The cost of any such repair or maintenance shall constitute an item of "expense" if and to the extent so provided in Article 15. Tenant expressly waives the benefit of any statute now or hereafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense, or to terminate this Lease because of Landlord's failure to keep the Premises in good order, condition and repair. Tenant waives the provisions of Civil Code 1932, 1933, 1941 and 1942 and all similar, successor or related provisions of law.

8.   **Alterations and Improvements**.

8.1   **Conditions**. All alterations, additions and improvements to be made by Tenant in, on, to or about the Premises, including without limitation, Tenant's Work, are referred to, collectively, as "**Alterations**." Tenant shall not make any structural Alterations, any Alterations in the storefront or the exterior of the Premises, any Alterations visible from outside the Premises or any Alterations that Landlord, in good faith, believes may adversely affect the value of the Premises or Phase One, without, in each instance, first obtaining the consent of Landlord, which may be withheld in Landlord's sole discretion; provided, however, that Landlord shall not unreasonably withhold, condition or delay its consent to Tenant's Work, which consent shall, in any event, be consistent with Paragraph 3. Tenant shall not make any Alterations affecting any of the systems for Phase One or the Project or any Alterations, or any related series thereof, costing more than $2,500 without, in each instance, first obtaining the consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed. Tenant shall, however, be permitted to make interior non-structural Alterations, or a related series thereof, costing less than $2,500, without Landlord's prior consent; provided, however, that such Alterations do not affect any of the systems of Phase One (any such Alteration, or series of related Alterations, a "**Permitted Alteration**"). All Alterations shall be subject to all of the terms, covenants and conditions of this Lease. Notwithstanding anything to the contrary contained in this Paragraph 8.1, however, Tenant may not perform any Alteration unless: (a) [intentionally omitted]; (b) the Alteration does not impair the structural strength of the Premises; (c) before proceeding with the Alteration, other than a Permitted Alteration, Tenant shall submit to Landlord, for Landlord's approval, complete, accurate, and detailed plans and specifications for the work to be done when the nature of the proposed work requires the same, and Tenant shall not commence or proceed with such work unless and until it obtains Landlord's approval therefor, as aforesaid; (d) Tenant shall pay to Landlord upon demand the reasonable direct, out-of-pocket costs and expenses actually incurred by Landlord for reviewing said plans and specifications and for inspecting the Alterations (but no such costs and expenses of review and inspection shall be charged to Tenant with respect to Tenant's Work) to determine whether they are being performed in accordance with the plans and specifications as approved and in compliance with law, which costs and expenses may include, without limitation, the fees of any architect, engineer and/or attorney employed by Landlord for such

ExHibit S

Kenneth J. McLaughlin, President
R.M. "Cook" Barela, Vice-President
Paul E. Hamrick, Director
James C. Huber, Director
Jack E. Smith, Director



## jurupa
### Community Services District

## PRETREATMENT PROGRAM

August 2, 2007

Mr. Donald Gibson
Mr. G's BBQ
8022 Limonite Avenue, Suite 101
Riverside, CA 92509

RE:    GREASE WASTE DISPUTE WITH JURUPA VALLEY SPECTRUM

Dear: Mr. Gibson:

This letter shall detail my involvement in the dispute between Mr. G's BBQ and the Jurupa Valley Spectrum regarding the installation of the grease interceptor for the restaurant.

On March 12, 2007, I was contacted by Cynthia Huber, representing the Jurupa Valley Spectrum regarding Riverside County's requirement for a grease interceptor letter from Jurupa Community Services District for Mr. G's BBQ at 8022 Limonite Avenue, Suite 101, Riverside, CA 92509. She indicated to me that the former Dairy Queen, which was to be occupied by Mr. G's BBQ, already had a grease interceptor. I let her know that the District had no record of a grease interceptor, but she insisted that she had personally observed the interceptor. I agreed to meet her at the site the next day to verify the existing conditions.

On March 13, 2007, I met with Ms Huber on-site and verified that there was no interceptor installed at the former Dairy Queen site. The "grease interceptor" that she observed was actually clean-outs for the sanitary sewer and the pipe that was stubbed out for a future grease interceptor installation. I confirmed with her that a new interceptor would need to be installed for Mr. G's BBQ.

If you have any questions, please call (951) 685-7434, Extension 110.

Sincerely,

*Daniel M. DuCasse*

Daniel M. DuCasse
Pretreatment Inspector

4246 Eng.

EXHIBIT #9

# The Tenant As Terminator:

## Constructive Eviction in Modern Commercial Leases

Eugene L. Grant[*]
Robert J. Krapf[**]
Joseph G. Lisicky[***]

Virtually all real estate attorneys have had clients ask if they can break their commercial lease because of some intolerable condition the landlord failed to fix. A review of the cases dealing with such disputes, reveals a continuing evolution in the ability of the tenant to invoke constructive eviction as a means to terminate the lease. In many respects, however, the more things change, the more they stay the same, when it comes to the tenant as terminator. Although the intolerable conditions may have changed in these modern times, the common law of constructive eviction still seems capable of dealing with the complexities of the modern commercial tenant's problems. That is not to say constructive eviction is unchallenged as the best means to deal with a lackadaisical landlord. There are detractors calling for implied warranties to provide an even bigger gun with which to blast the landlord, but they are a distinctly minority voice, and rightfully so, at least in the eyes of most commercial landlords.

The goal of this article is to examine in some detail the evolution in the constructive eviction remedy resulting from two categories of intolerable conditions that continue to grow in importance and prominence in modern commercial leases. The first category is the failure of the Landlord to bring the Premises in compliance with legal requirements, and the second is conditions existing outside of the leased premises such as common areas, adjacent land owned by the landlord or even intangible conditions such as the landlord's unfair competition or interference with the Tenant's business. The purpose of this examination is not only to get a feel for the direction in which the constructive eviction remedy is headed, but also illustrate why "consumer protection" principles such as the implied warranties doctrine has failed to make much of an advance on commercial leases and may actually be in retreat together with some of its kindred doctrines from the law of contracts. But before we can understand the role of these modern contract doctrines in commercial leases, we need to briefly review the evolution the landlord-tenant law.

The lease evolved as a species of real estate conveyance. The Tenant was essentially the "owner" of the land for a specified term, and had the entire responsibility for the condition of the land. Leases were short and sweet, almost like deeds. There was little if any need for a constructive eviction doctrine, because the Landlord had virtually no ongoing duties during the lease term. The covenant of the landlord was to not disturb the tenant's quiet enjoyment of the premises by an actual eviction. That worked in agrarian times when the land was primary and any buildings of only secondary importance.

Leasing evolved from a simple one page conveyance of an interest in agricultural land for a fixed term to the modern book length commercial space lease in a multi-tenant building. Virtually all those extra pages result from the Landlord's assumption of all, if not most, of the responsibility for the condition of premises and the land and the building of which the premises are a part. Even the complicated rent provisions are largely concerned with the determination of the landlord's ability to pass through to the tenant, in the form of additional rent, the cost of fulfilling the landlord's duties regarding the condition of the premises. The traditional independence of the tenant's rent covenants and the landlord's covenants regarding the condition of the premises would require the tenant to sue for cost of remedying any landlord defaults rather than conveniently deducting the cost from the next due rent. For a small space tenant in a large building, suing the landlord or even offsetting the cost against the rent is an impractical

remedy as in eliminate it will not be accessible until the entire building and the cost of remediation would often be prohibitive.

Case 6:10-bk-21907-SY    Doc 38    Filed 11/04/10    Entered 11/04/10 15:12:46    Desc
Main Document    Page 50 of 69

Constructive eviction evolved to solve this problem. To understand this evolution, its relationship to the quiet enjoyment covenant must be considered. Quiet enjoyment is traditionally the one covenant on which the rent depends. Essentially the covenant of quiet enjoyment mutated to include much more than just undisturbed possession of the premises. Originally the quiet enjoyment covenant meant the tenant wanted the landlord to stay away from the premises and leave the tenant alone. Now it means the landlord better be around on a daily basis to clean the premises, change the light bulbs, resupply the restrooms, maintain the communications, electrical, mechanical and other building systems, and provide security among other goods and services. The covenant now includes the enjoyment of all the ongoing goods and services promised by the Landlord which the courts feel are important to the enjoyment of the premises.

A constructive eviction occurs, therefore, through acts attributable to the landlord, by which a tenant is substantially deprived of the beneficial enjoyment of the leased premises.[1] It involves the surrender of possession by the tenant on justifiable grounds, rather than a deprivation of actual occupancy by direct action of the landlord. The mere breach by the landlord of its obligations under the lease is generally insufficient to establish that a constructive eviction has occurred. For a constructive eviction to be established, there must be a substantial interference with the tenant's possession or enjoyment of the leased premises. In most jurisdictions, this requires the tenant to vacate the leased premises within a reasonable time on the theory that if the tenant remained in possession, any interference caused by the landlord was not substantial.[2] On the other hand, some courts have held that if the tenant has not actually vacated the leased premises, the tenant can still establish a constructive eviction by showing that the landlord's acts deprived the tenant of the consideration for the rental which the tenant agreed to pay. [3]

Many jurisdictions also require a finding of the landlord's intent. In other words, the landlord must have intended to deprive the tenant of the use and enjoyment of the leased premises.[4] The evidence of this intent need not always be overt and direct. Courts have held that the requisite intent may be inferred from the character of the landlord's acts if their natural and probable consequences are such as to deprive the tenant of the use and enjoyment of the leased premises.[5]

A constructive eviction suspends the tenant's obligation to pay rent and permits the tenant to treat the lease as terminated.[6] In most instances, constructive eviction is alleged by the tenant either as an affirmative defense against the landlord's claim of breach of lease or to support a claim, or counterclaim, for damages.

The traditional grounds for constructive eviction has been intolerable physical defects in the premises itself such as the proverbial leaking roof. There are plenty of recently reported cases involving such facts due to the failure of the parties to clearly provide in the lease who was responsible for the particular physical defect in the Premises. Attorneys drafting commercial leases need to take note that these cases reflect a continuing erosion in the common law allocation of these responsibilities creating much uncertainty in the result if the allocation of responsibility is not explicitly addressed in the lease.[7] Constructive eviction has evolved far beyond the traditional building defect type of cases. Having reviewed the evolution of the remedy, we are now ready to consider in detail the conditions which are the real subject of this article, conditions daily becoming more important in our modern commercial leasing environment.

## 1. Failure to Comply with Requirements Ordered by Public Authorities

Having covered the basics, we can now turn to a detailed examination of the types of construction eviction claims which are the subject of this article. Constructive evictions based upon a landlord's failure to make repairs or improvements required by public authorities have been recognized by courts for over 100 years.[8] While most cases have involved the enforcement of local building codes for public safety purposes, more recent cases, involving asbestos remediation and sick building syndrome claims, have broadened the grounds on which a constructive eviction claim is based by focusing on the health of the tenant's employees and the habitability of the leased premises.

Under the typical situation, a public authority issues an order that certain repairs must be undertaken to correct deficiencies apparent in the leased premises or in the building in which the leased premises are located. If the repairs are not completed by the required date, occupancy of the leased premises (or the building) is prohibited until such time as the repairs are completed. Since, in such cases, the tenant is no longer permitted to occupy the leased premises, a constructive eviction claim can be established by the tenant by showing that the landlord was obligated to make the repairs.

The paramount issue in most constructive eviction cases arising under a failure to make repairs or alterations required by governmental authorities is whether the landlord or the tenant is responsible for compliance with the requirement. Since repairs required by public authorities generally involve safety and/or health concerns, public policy requires that there must always be a party obligated to undertake the repairs.[9]

A court will initially look to the intent of the parties as manifested in the lease. The threshold issue is easily resolved where the lease clearly imposes on the landlord the obligation to comply with requirements mandated by public authorities or otherwise requires the landlord to maintain the leased premises in compliance with applicable laws, codes and ordinances. Of course, there are few reported cases where the duty is clearly and expressly imposed on the landlord.

Where the lease is silent on the issue or where there are competing or ambiguous lease provisions, the court may attempt to determine the parties' intent by examining the prior conduct of the parties,[10] but most jurisdictions have focused on the nature of the repairs. If the repairs are determined to be substantial or structural, such that they could not have been contemplated by the parties at the time the lease was entered into, then the landlord is generally held responsible for making the repair. One reason for this rule is that repairs ordered by public authorities are generally of a type that would ordinarily fall outside of the tenant's common law duty to repair, and the expenses of compliance would more properly be regarded as capital expenditures to be paid for out of rental income.[11] Further, it is often considered inequitable for the tenant to be required to make extensive repairs that would inure primarily to the reversionary interest of the landlord. Since the landlord, as owner of the property, generally has the initial duty under most laws to comply with public requirements, the duty remains the obligation of the owner in his capacity as landlord absent an agreement to the contrary.[12] A typical "repair" or "compliance with laws" clause imposed on the tenant will not necessarily overcome these factors and allocate the responsibility to the tenant.[13]

One of the most comprehensive treatments of the factors considered by many courts when determining whether the landlord or the tenant has the duty to undertake repairs required by public authorities is found in *Brown v. Green*,[14] which involved an action by the landlord for collection of unpaid rent after the subtenant had vacated the leased premises as a result of the landlord's failure to abate asbestos contamination in the leased premises. A routine inspection of the leased premises found that debris containing friable asbestos had flaked onto furniture in a showroom operated by the subtenant. Subsequent air sampling confirmed the presence of airborne asbestos fibers at harmful levels and an abatement order was subsequently issued by the Department of Health Services. During the negotiations between the landlord and the subtenant over the responsibility for clean-up of the asbestos, the subtenant

moved its business operations into a portion of the leased premises that was being used as a warehouse. When the parties could not resolve the issue of responsibility for the abatement work, the subtenant ceased paying rent.

The trial court ruled in favor of the landlord, relying principally on the terms of applicable lease provisions to the effect that (I) the tenant was obligated to comply with applicable laws, statutes, ordinances, orders, etc. in effect during the lease term regulating the use of the leased premises, (ii) the tenant was obligated to keep the leased premises, structural and non-structural, in good order and repair, whether or not such work was required as a result of the tenant's use of the leased premises, and (iii) the landlord had no obligation of any kind to repair or maintain the leased premises. The appellate court affirmed and the issues were appealed to the California Supreme Court.

The court began its analysis by noting that unqualified covenants to maintain and repair the leased premises and to comply with applicable laws do not, standing alone, constitute an obligation to comply with laws that require substantial curative action. Further, while a tenant might be found liable to make repairs occasioned by its particular use of the leased premises, the asbestos condition at issue in this case would have manifested itself regardless of any particular use being carried on in the leased premises. As a result, rather than focusing on the literal text of the repair and compliance provisions in the lease, the court determined that it could properly consider other relevant lease provisions and other factors bearing on the intent of the parties.

The court first reasoned that broad repair and compliance covenants in long-term "net" commercial leases were probative of the parties' intent to shift the major burdens of property ownership onto the tenant. Whether the parties actually intended the allocation of responsibilities suggested by the lease covenants, however, was better evaluated by relevant factors outside of the four corners of the lease, particularly where, as in *Brown*, the parties used a preprinted form lease. The court then considered the following six factors:

(1) The relationship between the cost of the curative action and the remaining lease term. (Repair and compliance clauses are more likely to be construed literally if the tenant has sufficient time to amortize the repair costs.)

(2) The term for which the lease was made. (The longer the term, the greater likelihood that the parties intended to shift burdens of property ownership onto the tenant.)

(3) The relationship of the benefit to the tenant to that of the reversioner. (The length of the term in relation to the remaining useful life of the leased premises.)

(4) Whether the curative action is structural or nonstructural in nature. (Whether the repairs fall within the literal text of the lease covenants.)

(5) The degree to which the tenant's enjoyment of the leased premises will be interfered with while the curative action is being undertaken. (The greater the disruptive effect of the compliance action, the more likely it is that the repair is "substantial" and thus the landlord's duty.)

(6) The likelihood that the parties contemplated the application of the particular law or order involved. (Whether either party was aware or had reason to believe that the cited condition would require curative action during the lease term.)

Based upon an analysis of the foregoing factors, the court concluded that in the context of the particular lease entered into by the parties, the tenant assumed the burden of complying with the abatement order. Accordingly, the tenant's constructive eviction claim failed.

Interestingly, on the same day that the California Supreme Court issued its opinion in *Brown*, the court issued its opinion in the companion case of *Hadian v. Schwartz*,[15] which involved city-ordered repairs to a bar and cabaret. In that case, the court refused to impose the repair obligation on the tenant, concluding instead that the probable intent of the parties was that the landlord would be responsible for the repairs. The Court in *Hadian* was influenced by both the three-year term of the lease, which would have left little time for the tenant to amortize the cost of the repairs, and by the estimated cost of the repairs, which represented a substantial percentage of the aggregate rent due over the lease term.

Where there are no lease provisions addressing the issue of which party is obligated to make repairs to the leased premises required by public authorities, courts have usually concluded that the landlord has the duty to make such repairs. In *Polk v. Armstrong*,[16] the tenant was denied a certificate of occupancy for the leased premises (in this case, the entire building) because of an opening in one of the building walls that had been made to accommodate a prior tenant. The municipal authorities ordered the opening to be closed with a cement block wall. The landlord refused to construct the wall or permit the tenant to do so. When the tenant stopped paying rent, the landlord changed the locks and took possession of the building. In a damages action filed by the tenant, the Nevada Supreme Court determined that the construction of the block wall was a substantial alteration and was structural in nature. Noting that the parties had not contemplated any such municipal order at the time the lease was negotiated, the court ruled, based upon reasons similar to those articulated by the California Supreme Court in the *Brown* case, that the landlord was under a duty to construct the wall. Since the landlord's failure to repair the wall and comply with the applicable building code resulted in the refusal of the municipality to issue a certificate of occupancy, thereby preventing the tenant from occupying the leased premises, the court found that a constructive eviction had occurred and remanded the case to the trial court for a determination of damages.

Ambiguous lease provisions were considered by the Colorado Court of Appeals in *Millman v. Hernandez*.[17] The tenant in *Millman* had leased a building for use as a rooming and boarding house. Halfway through the three year lease term, city inspectors determined that the building was structurally unsound and ordered repairs that were estimated to cost between $47,000 and $70,000. Both the landlord and the tenant disclaimed responsibility for making the repairs. The tenant vacated the building and the landlord sued for, among other things, the loss of rental income and the cost of the required repairs. According to one provision of the lease, the tenant was obligated to "keep the leased premises in proper condition in order to meet all standards of the [city] building department," but under a separate provision of the lease the tenant was merely required to keep the premises in the same condition as when entered upon, reasonable wear and tear excepted. In order to resolve the competing provisions, the court considered other provisions of the lease, such as the landlord's duty to insure the leased premises against loss by fire, vandalism and casualty, and the prior conduct of the parties, such as previous structural repairs that had been undertaken by the landlord. The court concluded that the landlord was obligated to make the required structural repairs and its failure to do so justified the tenant's vacating the leased premises.

The interpretation of a fairly typical repair and compliance provision can be found in a declaratory action decided by the Wyoming Supreme Court in *Scott v. Prazma*.[18] Among other things, provisions in the lease obligated the tenant to keep the leased premises in good condition and repair at the tenant's expense and to conduct its business operations in compliance with all applicable governing bodies. The lease also stated that the landlord was not required to make any repairs to the building during the term. After an inspection of the leased premises revealed serious safety violations, the municipality ordered

the landlord to make extensive remodeling and structural repairs or else vacate the leased premises. The landlord refused to make the repairs and the tenant vacated the leased premises (as required by the municipality), claiming constructive eviction.

The *Scott* court noted that it could find no case which held categorically that either the landlord or the tenant was responsible for repairs ordered by public authorities, but rather that each case must be considered in light of its particular factual circumstances. The court then indicated that terms used in repair clauses are not technical, and that an agreement to "repair" does not constitute an agreement to "replace" or "remodel." Instead, the meaning of "repair" in the lease should be based upon the parties' intention when using the term. In this particular case, the court did not believe, after considering the short term of the lease, the cost of the repair and the resulting improvement in the condition of the leased premises (together with the corresponding increase in value), that the parties intended to shift to the tenant the burden of compliance with orders such as the one that was issued. This was especially true where the tenant was obligated only to maintain the leased premises in the same condition as at the beginning of the term. Since the burden of compliance rested on the landlord, the court concluded that the tenant established its right to claim a constructive eviction.

The failure of the landlord to permit the tenant to make required repairs has also been found to constitute a constructive eviction. The *Polk* case, discussed above, is one example of that situation. In *Gans v. L. Olchin & Co.*,[19] the tenant had sought permission to construct an exit that was required by the New York Department of Labor for the manufacturing facility operated by the tenant. The landlord refused to permit the work and the tenant was required by the State to cease using the leased premises. On appeal from a successful motion to set aside a verdict in favor of the landlord, the Connecticut Supreme Court of Appeals noted that in cases where a landlord has refused to consent to an act by the tenant without which the tenant cannot occupy the leased premises, there is a constructive eviction. The court went on to uphold the verdict in favor of the tenant.

While most reported cases ultimately impose upon the landlord the burden of compliance with mandated repairs, the tenant has been held responsible for such repairs under certain circumstances, such as in *Brown v. Green*, discussed above. Generally, however, the mere agreement of the tenant to comply with all laws, ordinances, rules and regulations does not, by itself, constitute an assumption by the tenant to comply with orders requiring improvements of a substantial or structural nature.[20] Instead, there must be a clear showing that either (I) the tenant knew that the repairs would probably be required, (ii) the tenant's specific use of the leased premises resulted in the need for the ordered repairs, or (iii) the tenant unequivocally agreed to be responsible for all repairs, including those deemed to be substantial and structural.

One such case is *Glenn R. Sewell Sheet Metal, Inc. v. Loverde*,[21] where the subtenant converted the leased premises from an automobile repair operation to a trailer park. During the conversion, a septic system was installed which later failed. When the subtenant could not make adequate repairs to the failed system, the county health department ordered that the trailer park be connected to a public sewer or that the use terminate. Both the landlord and tenant refused to pay for the connection, causing the subtenant to close the trailer park and later abandon the leased premises. The subtenant then sought to have the sublease declared unenforceable and its deposit returned. The California Supreme Court began its analysis by stating that a tenant who voluntarily puts the leased premises to uses different from those prior to its tenancy, thereby subjecting the premises to laws that were not previously applicable, must bear the burden of conforming the new use to the requirements of law. Otherwise, the landlord would be subject to the whim of a tenant who freely changes the use of the leased premises. The court also reasoned that a tenant who puts the leased premises to a particular use is charged with knowing the laws and regulations affecting such use. In this case, the tenant had accepted the leased premises in their as-is condition, knew (or should have known) that septic systems eventually fail and that connection to a

public sewer might be required, and therefore assumed the risk of later compliance with applicable laws.

A similar result was reached in *Ell & L. Investment Company v. International Trust Company*,[22] where the Colorado Supreme Court, based upon the surrounding circumstances and terms of the lease, held that the parties intended for the tenant to be liable for making substantial improvements and alterations that had been ordered by a local building inspector. The court noted in particular that the lease expressly provided that the landlord was not obligated to make repairs of any kind, that the tenant had previously made structural repairs and that the leased premises, although located at a prominent intersection in the City of Denver, had been leased on a long term basis at a fairly nominal rent (presumably because the parties recognized that due to the age of the leased premises and the term of the lease, substantial repairs would be needed during the term).

The constructive eviction doctrine has also been applied to situations involving improvements required to be made to the building of which the leased premises are a part, although not directly relating to the leased premises. In *Chernberg v. Peoples National Bank of Washington*,[23] the tenant operated a restaurant in a portion of a building located in Seattle, Washington. When the abutting building was razed, a former party wall became exposed and was determined to be structurally unsafe and in need of substantial repairs to satisfy the requirements of the City of Seattle Building Department. Although the leased premises did not abut the exposed wall, the tenant requested that the landlord make the necessary repairs, estimated to cost between $30,000 and $50,000. The landlord refused to make the repairs and terminated the lease because of the unsafe condition of the building. The lease required the tenant to make repairs necessary to maintain the leased premises, except for the outside walls and other structural components of the building within the leased premises, but was silent as to which party was obligated to maintain the structural components of the building. The Washington Supreme Court upheld a lower court ruling concluding that there was an implied duty on the landlord to make repairs mandated by government authority where such repairs arise from defective building conditions or are required for reasons of the public welfare. Further, even though the required repairs did not directly affect the leased premises, the court concluded that since the landlord did not fulfill its duty within a reasonable time after notification from the public authority, the landlord breached the implied covenant of quiet enjoyment which resulted in a constructive eviction of the tenant from the leased premises.

A similar result was reached in *Johnson v. Snyder*,[24] where the tenant rented a stall in the landlord's building for the operation of a restaurant. The restaurant, which at the time was one of only two occupants of the building, was ordered closed by a city inspector after he found unsanitary conditions in the building. Although the restaurant itself was found to be properly maintained, the rest of the building was in such a deplorable condition that the inspector was required "to take drastic steps and close the restaurant." Even though the lease required the tenant to comply with all requirements of public authorities pertaining to the leased premises, the California Court of Appeal was quick to distinguish the case from those where improvements were required to be made directly to the leased premises. In this case, the court noted that the tenant had no duty to abate a nuisance located in any portion of the building other than the leased premises, nor did the tenant possess an occupancy right to the portion of the building in need of repair, which remained under the landlord's exclusive control. The court concluded that "where the landlord leases part of a building and permits unsanitary conditions amounting to a nuisance to exist in the portion of the building remaining under his control which operate to deprive the tenant of his beneficial enjoyment, the tenant may treat this as a constructive eviction."

In addition to constructive eviction claims arising as a result of the tenant's inability to occupy any portion of the leased premises, tenants have also been successful in establishing a constructive eviction where only a portion of the leased premises was rendered untenantable. For example, in *Dennison v. Marlow*,[25] the tenant leased a two-story building for a five year term for use as a restaurant. During the first year of the lease, the tenant received a letter and a cease and desist order from the state fire

marshal, advising the tenant that the building was in violation of the state safety code due to, among things, the absence of an automatic sprinkler system. At a hearing, the state fire board ordered the second floor of the building closed until the sprinkler system was installed, thereby reducing the restaurant's seating capacity by over 50%. The landlord, however, informed the tenant that if the tenant wanted to continue to use the second floor of the building, it would have to pay for the installation of the sprinkler system. The tenant did not install the sprinkler system, but instead began paying a reduced rental since it occupied only the first floor. The landlord later sued to collect the rent that had not been paid. Based upon an analysis similar to that used in *Brown v. Green*, discussed above, the New Mexico Supreme Court found that the landlord was obligated to install the sprinkler system and that its failure constituted a constructive eviction of the tenant. The tenant then claimed that the constructive eviction should result in the suspension of all rent due under the lease. Noting the general requirement that the tenant must vacate the premises to sustain a constructive eviction claim, the court found that the landlord's failure to install the sprinkler system compelled the tenant to vacate only the second floor of the building. Since the tenant was not deprived of the use of the first floor of the building, the court concluded that the landlord's failure resulted in only a partial constructive eviction and that the tenant remained obligated to pay the fair rental value for the use of the first floor.

## 2. Asbestos

As demonstrated in *Brown v. Green*, the presence of asbestos can be the basis for claims of constructive eviction. Asbestos removal was also the focus in *SunAmerica Financial, Inc. v. 260 Peachtree Street, Inc.*[26] The tenant sought to sublease the leased premises, as permitted under the lease, but was having difficulty, ostensibly due to uncertainty regarding the abatement or encapsulation of asbestos which had been applied directly to structural supports and decking. In order to facilitate its subleasing activity, the tenant sought the consent of the landlord to abate all of the asbestos from the 12 1/2 floors of the leased premises that the tenant had already vacated for administrative reasons. The landlord, however, refused to approve the renovation or consider abatement concerns without a subtenant who presented its own remediation plan. The tenant then ceased paying rent and the landlord filed suit. After a trial court ruling that a constructive eviction had not occurred, the Georgia Court of Appeals examined the issue by first analyzing the landlord's refusal to consent to the tenant's remediation plan. The court noted that under the lease, the tenant was permitted to sublet the leased premises without the consent of the landlord and that, to effectuate such a provision, various forms of renovation would need to be permitted. A separate lease provision, however, required the tenant to obtain the landlord's consent in order to make additions and improvements. Finding that the right to sublease was a substantial incentive for the tenant to enter into the lease, the court reasoned that the landlord had an implied obligation not to refuse to give its consent where the proposed changes were of equal or greater quality than the original condition of the premises. The court then ruled that the landlord's unreasonable refusal to permit the tenant to abate the asbestos deprived the tenant of the beneficial use and enjoyment of the leased premises for purposes of subleasing. The court, however, remanded the case to the trial court to determine whether the landlord acted with the required intent and whether the landlord's conduct rendered the tenant's use of the premises merely uncomfortable or actually unfit for subleasing.

## 3. Americans with Disabilities Act

The authors are not aware of any reported cases involving constructive eviction claims based upon a landlord's failure to make repairs or improvements required by the Americans with Disabilities Act. This is not surprising since it is unlikely that a tenant must actually vacate the leased premises as a result of non-compliance. For example, a landlord might refuse to permit a restaurant tenant to allow guide dogs into the leased premises. While the tenant may have other types of claims against the landlord, the tenant

would probably be unable to establish a constructive eviction since the tenant could continue to conduct its business operations in the leased premises. On the other hand, situations leading to a constructive eviction claim might be possible where, for example, the tenant's business operations are impossible without handicapped accessibility in the areas that are the landlord's responsibility. If the landlord fails to comply with a building code requirement regarding accessibility, thereby forcing the tenant to cease its business operations, it might be possible for the tenant to claim constructive eviction.

## 4. Sick Building Syndrome

One of the newer bases for liability in the landlord-tenant relationship is "sick building syndrome," which can be generally defined as an excess of work-related irritations of the skin and mucous membranes, and symptoms such as headache and fatigue, experienced by workers in modern office buildings.[27] Much of the impetus for sick building syndrome was the construction industry's desire during the 1970s and 1980s to make buildings "tighter" in an effort to reduce costs by increasing energy efficiency. There is also a recent personal injury case where a tenant's employee convinced the court that landlords constructing and leasing new commercial buildings have a duty to understand and avoid sick building syndrome due to venting of harmful volative organic compounds from the construction materials.[28] While more commonly alleged under tort and negligence theories by employees of the tenant, sick building syndrome has begun to be asserted by tenants as a basis for constructive eviction.

The tenant in *Longstreet Associates LP v. Gordon Investment New York, Inc.*[29] raised sick building syndrome as one of several defense to the landlord's action for unpaid rent. As alleged by the tenant, the poor air quality in the leased premises amounted to a partial actual eviction, thereby alleviating the tenant of its obligation to pay rent.[30] The New York Supreme Court, however, ruled that the tenant had failed to prove its case. The only evidence offered by the tenant was an affidavit from an employee stating that complaints about the air quality had been made for several years. The tenant did not provide any medical or scientific evidence or any test reports to support its claim. The landlord, on the other hand, submitted proof that it regularly monitored the air in the building and that test results consistently indicated that there were no problems with the ambient air quality.

While *Longstreet* did not involve repairs or improvements required by public authorities, the American Society of Heating, Refrigerating and Air-Conditioning Engineers, a professional organization charged with developing and recommending industry standard ventilation rates, has published air quality standards and it is possible that a local municipality could adopt the standards in the same manner as it might have adopted the BOCA building code, and then seek to enforce the standard in order to protect the public.

Of course, one of the problems with sick building syndrome and the analysis of indoor air pollution is that the sources of pollutants can be outside of the landlord's control, such as the tenant's furniture or equipment. This may serve to complicate the determination of the landlord's responsibility, particularly if the offending condition results from the interaction of substances arising from the building and mixing with those arising from the tenant's property. Likewise, radon or electromagnetic fields arise from conditions outside of the building over which the landlord typically has no control. It is not difficult to envision a constructive eviction claim by the tenant based on the landlord's failure to vent the building sufficiently to eliminate or reduce radon contamination or on the landlord's failure to locate the building away from, or to provide adequate shielding from, electromagnetic field sources.

## 5. Economic Interference by Landlord

The concept of breaching the covenant of quiet enjoyment by creating adverse economic conditions has been accepted for a long time in many jurisdictions.[31] With the aging of the regional malls and the shift to big box developments, it is becoming increasingly common for landlords to reconfigure and renovate their malls, often destroying the businesses of some tenants in the process. In *Pollack v. Morelli*,[32] the Pennsylvania Superior Court found that a landlord had breached the covenant of quiet enjoyment, resulting in constructive eviction, when the tenant's leased premises were fully enclosed in a newly expanded mall.[33] The leased premises were originally part of an open shopping center with an adjacent parking lot. Without prior notice to the tenant, the landlord began renovating the center into a mini-mall which enclosed and surrounded the leased premises. A new store was built in front of the leased premises, and the only access was through the doors to the mall. The display windows and signs were only visible from inside the mall, and the closest parking area was one hundred feet away. The court held that the loss of the valuable features of the leased premises due to the construction of the mini-mall substantially interfered with the tenant's use of the leased premises, and compelled the tenant to relocate, thereby resulting in a constructive eviction.

A more recent decision by the Wisconsin Court of Appeals in *N/S Associates v. McDonald's Corp.* involved the operation of a McDonald's restaurant located in an enclosed shopping mall.[34] McDonald's paid percentage rent and had a penalty rent clause which protected the landlord if McDonald's gross sales were low. A successor landlord installed a food court in the mall in such a manner that part of the common area was used as the seating for the food court. Accordingly, McDonald's felt its payments for common area charges were unfairly being used to subsidize its competitors. McDonald's was also in a disadvantageous location relative to the food court, and the tenants in the food court were paying a higher percentage rent to the landlord. McDonald's felt that the landlord had restructured the mall intentionally to divert food customers from McDonald's to the food court in order to maximize the landlord's income at McDonald's expense. The court reversed a summary judgment in favor of the landlord, finding that if McDonald's could prove the facts alleged, then the landlord would have been in breach of the lease.[35]

The landlord sued McDonald's after it abandoned the premises, and McDonald's attempted to terminate the lease based on a constructive eviction theory. McDonald's pled the affirmative defenses of failure to perform obligations under the lease, fraud, commercial frustration/impossibility, unconscionability, estoppel, unclean hands, failure to mitigate damages, and unjust enrichment. It also pled as counterclaims, breach of contract, breach of covenant of quiet enjoyment, breach of covenant of good faith and fair dealing, breach of covenant not to compete with a tenant under a percentage rent lease that contains a penalty rental clause, and fraud. The court made the strong statement that each of these defenses and counterclaims would be valid if McDonald's proved the facts alleged by it. It is notable, however, that the common area provisions of the lease did not contain the common disclaimer and reservation regarding diminishing or modifying common areas.[36]

The specific provisions of the lease are often the focal point in economic constructive eviction cases. In the *McDonald's* case, the court relied heavily upon the fact that the lease required the common areas to be maintained by the landlord for the benefit of the tenants. In *Carrols Corp. v. Canton Joint Venture*, [37] decided by the Ohio Court of Common Pleas, a disclaimer of liability for any alterations to the common areas was relied upon successfully to reject a claim by a Burger King franchisee that the landlord had breached the lease on facts and theories similar to those in the *McDonald's* case. It should be noted, however, that courts have not found constructive eviction where the conditions are beyond the landlord's control, such as a general economic decline in the vicinity of the leased premises or the adverse conduct of third parties.[38]

## 6. Harassment by Landlord

Similar to the economic interference with the tenant's enjoyment of the leased premises is outright harassment of the tenant by a "jilted" landlord. In a case where the landlord's retaliation backfired, the Supreme Court of Tennessee held that a constructive eviction occurred where the harassment culminated in the landlord's wrongful declaration of default. In *Tenn-Tex Properties v. Brownell-Electro*,[39] a longtime office tenant moved out instead of renewing its lease as the landlord desired. Upon being notified of the tenant's intent to relocate, the landlord began making demands which became more and more strident and assertive, culminating in the wrongful declaration of default for having moved out of the building before the lease expired, there being no continuous occupancy covenant in the lease. The court decided that this led to the inevitable conclusion that there was a constructive eviction of the tenant by virtue of the landlord's conduct, which amounted to a breach of the covenant for quiet enjoyment.[40] The court held that unreasonable demands, threats, insults, or assaults can form the basis for a constructive eviction claim.[41]

## 7. Condition of Common Areas

Commercial leases for multi-tenant projects commonly include rights to use certain areas and facilities in common with other tenants, such as parking areas, rooftop telecommunications equipment areas, signs with multiple tenant faces on them, open space areas and the like. These common areas and facilities are also often essential to the use of the leased premises. Of course, office building tenants may not have the same level of concern with visibility and traffic flow as retail tenants.

Renovation of common areas in office projects have been the subject of constructive eviction claims. The New Hampshire Supreme Court recently upheld such a claim where office building renovations inconvenienced the tenant.[42] The court refused to go so far as to find a constructive eviction since there was always at least one means of entering and leaving the leased premises, but it did find a breach of the quiet enjoyment covenant based on the interference which resulted from the landlord's work on the common areas, and remanded the case to the trial court to determine damages. The court rejected the old view that the covenant of quiet enjoyment protects only the mere possession of the leased premises and not the fulfillment of the tenant's expectations and contractual rights for common areas under a modern office lease.

For both retail and office space, common area parking is often crucial to the enjoyment of the leased premises. While it might be expected that inability to use the parking garage would constitute a constructive eviction, the Minnesota Court of Appeals determined otherwise in *Thoele Printing, Inc. v. First Trust National Ass'n*,[43] a case involving a successor landlord who purchased the leased premises at a foreclosure sale. According to the court, since the successor landlord was subject to privity of estate, but not privity of contract, the landlord was not liable for any breach of the lease that occurred prior to its purchase of the leased premises. While it may be surprising that the court did not view the defective condition of the parking garage as a continuing breach of the lease that required repair by the successor landlord, the court may have been persuaded by provisions in the lease explicitly obligating the landlord only for ordinary maintenance and not the costly structural repairs which were necessary to allow the parking garage to be used again.

## 8. Presence of Objectionable Cotenants

Retail leases often contain restrictions against objectionable cotenants of the shopping center as well as requirements regarding cotenancy of anchor tenants to generate the traffic needed to make the project profitable for all. The distinction between inconvenient and intolerable conditions was highlighted by

the North Carolina Court of Appeals in *McNamara v. Wilmington Mall Realty Corp.*[44] The *McNamara* case involved the abandonment of a jewelry store because of a noisy aerobics studio neighboring the leased premises. The court held that seven to eight months was a reasonable period of time after which to abandon the leased premises, considering that the tenant had made several complaints regarding the noise and had awaited curative action by the landlord. While the lease had no restriction on consequential damages (the lower court awarded lost profits), the court of appeals remanded on that issue due to the speculative nature of the evidence.

The Missouri Court of Appeals also addressed problems created by a neighboring tenant in a case that involved an injunction obtained by one. In *Shop 'N Save Warehouse Food, Inc. v. Soffer*,[45] the landlord had included an exclusive clause in a lease protecting a grocery store tenant from competition by the landlord leasing to another grocery store within a specified radius of the leased premises. The exclusive clause contained an exception for a mortgagee as successor landlord. The landlord then structured transfers to take advantage of the exception without really changing the ownership of the property in substance. The landlord induced another grocery store tenant to enter into a lease within the area subject to the exclusive clause by showing that prospective tenant an opinion letter from the landlord's attorney but withholding from the tenant a side letter from the attorney cautioning the landlord that the transfers could be viewed as a sham transaction to avoid the intent of the lease. When the original tenant obtained an injunction based on the sham transaction theory, the new tenant sued the landlord and received a million dollar judgment for damages based on its inability to use the premises for a grocery store as a result of the court order. The court held that the injunction obtained by the original tenant constituted a breach of the quiet enjoyment covenant and a constructive eviction of the new tenant. The court rejected the landlord's claim that the new tenant could use the leased premises for any use other than a grocery store, holding that the quiet enjoyment warranty protected the intended use.

## 9. Interruption of Utility Services

As telecommunications become more prominent and continue to expand, utility services such as electricity, HVAC, and telephone become more essential for meaningful use of the leased premises. There are, however, no recent appellate constructive eviction cases based on the interruption of these services. There is one case that upheld a claim for breach of the covenant of quiet enjoyment based upon the interruption of water service to commercial premises due to the fault of the landlord.[46] This case would seem to suggest that Landlords have exposure to constructive eviction claims where the lease provides that utility services will be supplied by the Landlord and the interruption is at least in part due to the Landlord's fault.

Tenants seem to be increasingly negotiating for both rent abatement and lease termination rights due to utility service interruptions regardless on a no fault basis. Landlords forms typically disclaim any responsibility for damages and any right to abate rent payments due to service interruptions. Understandably, landlords do not want to be guarantors of the utility providers. They view themselves as being in the real estate industry and not the utility industry. Services are provided by the utility company through the landlord as a conduit and not normally as a profit center for the landlord. These concerns notwithstanding, it is common for landlords to subject themselves to loss of rent and even termination of the lease if services are interrupted for time periods as short as 48 hours. This seems surprising and disturbing in light of the traditional contractual allocation of rights and remedies upon the occurrence of physical damage to the premises by fire or other casualty which should provide a model for the parties to reach a compromise on these utility service issues. The traditional damage or destruction clause in a commercial lease will allow termination by the tenant, if at all, only if the landlord is unable to restore the premises to serviceability within a much longer period of time such as 180 days. Rent is abated from the date of the damage until the restoration is complete. The landlord protects itself by obtaining

property insurance to pay for the restoration and that includes rent loss coverage to replace the abated rent payments. The tenant generally accepts the fairness of having to do business in a temporary location until the premises can be restored.

There is no apparent reason to distinguish between the tenant having to use temporary space due to a service interruption as compared to physical damage to the premises. In an intangible sense, the premises are temporarily damaged when services are unavailable. In many instances the cause of the utility interruption will be some physical damage to the building such as a fire. The parallel and overlap between these two types of "intolerable" conditions seems obvious, and the lease provisions should also be parallel. The only significant difference is that the risks covered by the landlord's insurance will not be coextensive with the risks which can cause an interruption of services. For example, damage to the generating equipment of the utility company will not constitute an insured risk that would trigger the rent loss coverage under the landlord's insurance policy. Normal rent loss coverage is triggered only by an insured occurrence of physical damage to the landlord's property and not the property of third parties such as the utility company. The hard issue for interruption of services is when the interruption is due to reasons other than damage to the landlord's property. The concern of the landlord is that an uninsured loss of rent could jeopardize the ability to service any montage debt on the premises. Accordingly, landlords and their attorneys who agree readily to an abatement of rent for any interruption of services are jeopardizing their investment. It would be far better to bargain for a rent abatement only to the extent rent loss insurance coverage will be available to replace the loss and let the Tenant look to its business interruption insurance for compensation due to interruptions not covered by the Landlord's insurance.


## 10. Beyond Constructive Eviction to an Implied Warranty of Fitness?

The introduction to this article traced the evolution of the constructive eviction remedy as a response to the changing nature of the commercial lease from being primarily a conveyance of a real estate to being a combination of the real property interest and a contractual bundle of goods and services to be provided over the term of the lease. Quiet enjoyment came to mean much more than simple undisturbed physical possession of the premises, but as the name "constructive eviction" implies, the remedy was limited to terminating the lease by abandoning the premises. The disturbance was not substantial enough to constitute a violation of the quiet enjoyment covenant if the Tenant was not forced to actually abandon the space. If the Tenant stayed then the common law remedy would be to cure the landlord's default and sue for the damages. Because of the independent nature of the rent and condition of the premises covenants, offsetting rent against remediation costs would allow the landlord to terminate the lease based on the tenant default.

Some courts felt an evolutionary result too conservative and in effect called for a revolution in the law. They perceived the real estate legal principles as being too favorable to landlords, and wanted a liberal "new deal" of modern contract law principles more favorable to the tenant. With respect to the condition of the premises, these courts inferred entirely new warranties as the tool that would allow the tenant to withhold rent if the landlord failed to perform as promised during the lease term. This revolutionary approach found wide acceptance in the form of an implied warranty of habitability in residential landlord-tenant legislation that swept across the country in the name of consumer protection earlier in this century. A few states extended the implied warranty of habitability to commercial leases, at least where the lessee is a small business owner.[47] Similar contract law principles gained even more acceptance in the commercial leasing law such as requiring a reasonable basis for withholding consent to assignment based on the principle of good faith and fair dealing or requiring the landlord to use reasonable efforts to relet the premises based on the mitigation of damages principle in the event of an abandonment.

The implied warranty of habitability has not been extended to commercial leases as a warranty of fitness in the vast majority of jurisdictions.[48] Generally, courts have reasoned that the factors which justify an implied warranty in residential leases do not exist in commercial leases. First, commercial tenants are in a better position to inspect the leased premises or hire an expert to do so. Second, the commercial tenant's economic resources and the greater availability of commercial space create a more equal bargaining power between the landlord and the tenant. Third, lessors of commercial property have a greater incentive to attract and retain commercial tenants in order to have a steady rental income. Fourth, commercial tenants are able to pass along to customers the cost of inspection or repairing defects.

The Supreme Court of Texas, however, rejected these concepts when it overruled earlier authority and held that a lessor in a commercial lease impliedly warrants that the leased premises are suitable for their intended commercial purposes. In *Davidow v. Inwood North Professional Group-Phase I*,[49] the leased premises were used as a medical office. Shortly after moving in, the tenant began experiencing problems: the air conditioning did not to work properly; the roof leaked; the hallways were dark because lights were not replaced; the leased premises were infested with pests and rodents; cleaning and maintenance were not provided; the parking lot was filled with trash; hot water was not provided; and several burglaries and acts of vandalism occurred.

The court concluded that it cannot be assumed that a commercial tenant is more knowledgeable about the structure's quality than a residential tenant. Commercial tenants may have little incentive to make any extensive repairs to the leased premises since commercial leases are often short-term. As a result, commercial tenants rely on their landlord's greater abilities to inspect and repair the leased premises. The factors which the court deemed important in determining whether there had been a breach of warranty were: the nature of the defect, its effect on the tenant's use of the leased premises, the length of time the defect persisted, the structure's age, the amount of the rent, the area in which the leased premises were located, whether the tenant waived the defects, and whether the defect resulted from any unusual or abnormal use by the tenant.

At least one state has attempted to put "new wine in old bottles" by holding the tenant may recover damages for breach of the quiet enjoyment covenant and thereby implicitly holding that a tenant may withhold rent even if the breach does not rise to the level of even a partial constructive eviction.[50] This is really just disguising the implied warranty of fitness in the clothing of the quiet enjoyment covenant. It is questionable whether the court realized the implications of its holding, and it is to be expected that a different result may occur if in the future they are faced with a rent withholding case based upon a claimed violation of the quiet enjoyment covenant without at least a partial abandonment of the premises. The hard issue that needs to be faced is whether the tenant should be able to withhold rent as opposed to paying the rent and suing the landlord to recover the remediation costs and other damages if the tenant stays in the premises.

Most experienced real estate lawyers understand the dynamics involved in disputes over the condition of the premises. The Tenant has the advantage of possession of the rent while the landlord has the advantage on gaining possession of the premises by summary eviction for failure to pay the rent. Giving the Tenant the advantage of both possession of the rent and the premises could create an imbalance of power particularly if the landlord is financially weaker than the tenant. In the commercial context this is often the case. Tenants are often financially strong corporations and landlords are often relatively weak investors. The uniformity of the financial strength of the landlord and the weakness of the tenant in residential leasing just does not exist in commercial leasing. Withholding rent can unfairly coerce landlords into accepting unjustified tenant's demands. This may be the real underlying reason why most courts have rejected implied warranties in commercial leases when faced with the issue, upholding instead the traditional constructive eviction remedy based on the quiet enjoyment covenant.[51] This may reflect a larger recognition that the importation of contract law principles into the commercial

landlord-tenant field has created some unexpected problems. Many recent cases seem to reflect a retreat from the high water mark of the contract law approach to a more hybrid result that reconciles and synthesizes the contract law and real estate law principles.[52] The New York Court of Appeals decided in 1995 to be openly counter revolutionary opting for the traditional rules and flatly rejecting the need to tilt the balance in favor of the commercial tenant on the issue of mitigation of damages.[53] There are those jurisdictions, however, where the revolutionary fervor seems entirely unabated with deeply troubling results for landlords and their attorneys. [54]

Of course tenants will argue they are put in a similar financial bind if they have to pay both rent and the remediation cost of the landlord's default. To some degree they are in fact paying double at least until they can get a judgment and recover damages. Essentially this is a debate over who will have to wait until after the period of dispute resolution to recover their money. If "justice delayed is justice denied" then the solution is to speed up justice as opposed to endlessly debating who should bear the financial burden of waiting to recover remediation costs or the wrongfully withheld rent, as the case may be. In the end it appears the real culprits are dilatory courts, and until they dispense speedy justice, the best compromise solution is to bypass them by means of expedited ADR. Either the landlord or the tenant (depending on the state of the law on implied warranties in the particular state) should at a minimum insist on expedited ADR as the means to level the playing field unless they have the leverage to simply overpower the other party in the negotiating process and totally disclaim all warranties, express or implied. It takes a lot of negotiating leverage, however, to overcome these contract law principles such as implied warranties, good faith and fair dealing and mitigation of damages, once adopted by the courts as the general rule governing commercial leases. The compromise would be a tenant right to set off remediation cost against rent only after expedited arbitration resolves any dispute over the issue of whether a material breach has occurred. If implied warranties have been adopted then the compromise would be to prevent withholding of rent pursuant to a warranty claim if the Landlord disputes the alleged breach and submits it to expedited arbitration.

## CONCLUSION

Although several conclusions may be drawn from this survey of the law of constructive eviction as it relates to various intolerable conditions, one obvious conclusion is that modern lease law is as much, if not more, about the lease as a contractual package of goods and services as about tenancy. Where once the structural condition of the leased premises might have been the principal basis for a claim of constructive eviction, now environmental conditions, economic actions of the landlord or the activities of cotenants may be an enforceable basis of such a claim. Tenants knowledgeable in leasing law are not reluctant to challenge intolerable conditions in order to protect their expectations. They will push for the extension of the quiet enjoyment covenant and constructive eviction far beyond their traditional reach and argue for implied warranties of fitness and suitability. Landlords knowledgeable in leasing law are resisting these efforts to change the law, and when that fails, are disclaiming or limiting their common law obligations to the extent possible. Knowledgeable and powerful tenants, on the other hand, are insisting upon express warranties of fitness where they are not implicit.

The courts often find the text of leases ambiguous as to whether the landlord is responsible for a particular condition. The court will then look to all of the relevant facts and circumstances to discern and uphold the perceived intentions of the parties. All of this should caution attorneys working with commercial leases to be fully informed on the continuing evolution of the commercial leasing environment and to draft their leases accordingly. While leaving the lease silent on certain issues may be beneficial in the right circumstances, relying on the shifting sands of the common law decisions most often does the client a disservice. More often than not, the best course is to explicitly allocate the risk of all material adverse conditions which are foreseeable before they arise. Careful attention to the internal

consistency of the lease is also critical if the lease is to be determinative.

The popularity of applying contract law principles to commercial leases appears to be waning somewhat, and there are signs of a renewed regard for the traditional principles of real estate law. As a result it seems unlikely there will be any general acceptance of implied warranties in commercial leases. What does seem certain is that the covenant of quiet enjoyment and the constructive eviction remedy will continue to evolve to meet the needs of Landlords and tenants in an evermore densely populated and regulated urban environment dealing with new services and technologies only dreamed of in the

[*]Shareholder, Schwabe, Williamson & Wyatt, Portland, Oregon

[**]Director, Richards, Layton & Finger, P.A., Wilmington, Delaware

[***]Associate, Richards, Layton & Finger, P.A., Wilmington, Delaware

[1]Scott v. Prazma, 555 P.2d 571 (Wyo. 1976).

[2]Sigsbee v. Swathwood, 419 N.E.2d 789 (Ind. Ct. App. 1981); Stevan v. Brown, 458 A.2d 466 (Md. Ct. Spec. App. 1983)(tenant waives its rights if it waits an unreasonable length of time before vacating premises); Sewell v. Hukill, 356 P.2d 39 (Mont. 1960)(tenant must show permanent interference with beneficial enjoyment and abandonment of possession within a reasonable time thereafter).

[3]Mileski v. Kirby, 113 P.2d 950 (Wyo. 1941).

[4]Stevan v. Brown, 458 A.2d 466 (Md. Ct. Spec. App. 1983); Mileski v. Kirby, 113 P.2d 950 (Wyo. 1941).

[5]See Dennison v. Marlowe, 744 P.2d 906 (N.M. 1987)(intention of parties as expressed in lease in light of surrounding circumstances is determinative); Thirteenth & Washington Sts. Corp. v. Nelson, 254 P.2d 847 (Utah 1953)(intent is ordinarily of a purely legal nature inferred from the character of the landlord's acts).

[6]Scott v. Prazma, 555 P.2d 571 (Wyo. 1976).

[7]See First Class Condition: Responsibilities, rights, and Remedies Respecting the Condition of Commercial Leasehold Premises, 29 Real Property, Probate and Trust Journal 735 (Winter 1995).

[8]See Bradley v. DeGoicouria, 12 Abb. N.C. 53, 12 Daly 393, 67 How. Pr. 76 (N.Y. 1884) (landlord's failure to comply with board of health order resulted in defective plumbing which justified tenant's abandonment of leased premises); Pratt v. Grafton Electric Co., 65 N.E. 63 (Mass. 1902) (constructive eviction claim, although unsuccessful, based upon landlord's failure to comply with order of county commissioners to replace mill gates); Younger v. Campbell, 163 N.Y.S. 609 (N.Y. App. Div. 1917) (landlord could not recover rent where tenant was evicted by public authorities due to landlord's failure to make expensive and unforeseen structural repairs ordered by fire marshal); Galland v. Shubert Theatrical Co., 105 Misc. 185, 172 N.Y.S. 775 (1918) (failure of landlord to make structural alterations resulted in an eviction constituting a defense to an action for rent). See also 86 A.L.R.3d 352, Failure of Landlord to Make, or Permit Tenant to Make, Repairs or Alterations Required by Public Authority as Constructive Eviction (1976).

[9]Polk v. Armstrong, 540 P.2d 96 (Nev. 1975).

[10]Millman v. Hernandez, 535 P.2d 263 (Colo. Ct. App. 1975).

[11]Polk v. Armstrong, 540 P.2d 96 (Nev. 1975).

[12]*Id.*

[13]*See* cases discussed in M. Glazerman, *Who Pays for Asbestos Remediation--Landlord or Tenant?*, 35 Probate and Property (Nov./Dec. 1995).

[14]884 P.2d 55 (Cal. 1994).

[15]884 P.2d 46 (Cal. 1994).

[16]540 P.2d 96 (Nev. 1975).

[17]535 P.2d 263 (Colo. Ct. App. 1975).

[18]555 P.2d 571 (Wyo. 1976).

[19]145 A. 751 (Conn. 1929).

[20]Dennison v. Marlow, 744 P.2d 906 (N.M. 1987). *But see* Kintner v. Harr, 408 P.2d 487 (Mont. 1965) (tenant unable to establish constructive eviction as defense to landlord's action for rent after landlord refused to undertake repairs required by state board of health where tenant had expressly agreed to occupy leased premises so as not to violate any laws of city or state in which leased premises was located).

[21]451 P.2d 721 (Cal. 1969).

[22]286 P.2d 338 (Colo. 1955).

[23]564 P.2d 1137 (Wash. 1977).

[24]221 P.2d 164 (Cal. Ct. App. 1950).

[25]744 P.2d 906 (N.M. 1987).

[26]415 S.E.2d 677 (Ga. Ct. App. 1992).

[27]For a general overview of sick building syndrome, see Comment, *Stuck inside these four walls: recognition of sick building syndrome has laid the foundation to raise toxic tort litigation to new heights*, 26 Tex. Tech. L. Rev. 1041 (1995).

[28] Mackey v. TKCC, Inc., 894 P.2d 1200 (Or. App. 1995)

[29]New York Law Journal, December 20, 1995, p.26, col. 4 (N.Y. Sup. Ct.).

[30]While the tenant alleged there had been an partial actual eviction, the tenant had vacated the

premises independently of any possession proceeding instituted by the landlord.

[31]*See* Stockton Dry Goods Co. v. Girsh, 227 P.2d 1 (Cal. 1951)(constructive eviction of tenant paying percentage rent where landlord leased second shoe department in department store); Daitch Crystal Dairies, Inc. v. Neisloss, 167 N.E.2d 643 (N.Y. 1960)(where lease prohibited other supermarkets in shopping center, constructive eviction of tenant paying percentage rent when landlord constructed building on adjoining land for supermarket); Berland's, Inc. of Tulsa v. Northside Village Shopping Center, Inc., 378 P.2d 860 (Okla. 1963)(constructive eviction where store space and parking area were not built according to original plan); Lilac Variety, Inc. v. Dallas Texas Co., 383 S.W.2d 193 (Tex. Civ. App. 1964)(where lease provided that supermarket would be anchor tenant in shopping center, tenant constructively evicted when supermarket closed).

[32]369 A.2d 458 (Pa. Super. Ct. 1976).

[33]For cases having a similar result, see Bermuda Avenue Shopping Center Associates v. Moe Rappaport, 565 So. 2d 805 (Fla. 1990)(court found tenant was constructively evicted when mall renovation began shortly after lease commencement with no disclosure to tenant of renovation plans) and Sigsbee v. Swathwood, 419 N.E.2d 789 (Ind. Ct. App. 1981)(trial court found constructive eviction due to installation of traffic barrier, but decision was reversed on appeal due to tenant's unreasonable delay in vacating leased premises).

[34]514 N.W.2d 879 (Wis. 1994).

[35]All of the facts described herein were not stated in the cited opinion. The additional facts were drawn from the article: *Fair is Fair: Implied Covenants in Commercial Leases*, Real Est. Rev., Fall 1995, at 68-72, which does not disclose the source of the additional information.

[36]Consider whether the result would have been the same if the landlord had installed a food court that created a new common area for seating paid for only by the food court tenants. McDonald's might have argued that it would have violated the implied covenants of good faith and fair dealing, a corollary of which would be not to compete with a tenant paying percentage rent with a penalty clause for low gross sales. Just as the landlord wants implied continuous operation covenants for tenants paying percentage rent, those same tenants want implied covenants from the landlord not to compete with them. The latter type of implied covenant is essentially a means for a tenant to seek remedies for adverse economic conditions due to changes in the area controlled by the landlord outside of the premises.

[37]No. 88-2115-1, 1990 WL 99047 (Ohio Comm. Pl. 1990).

[38]Net Realty Holding Trust v. Nelson, 358 A.2d 365 (Conn. Super. Ct. 1976); First Wis. Trust Co. v. L. Wiemann Co., 286 N.W.2d 360 (Wis. 1980). *But see* Reisterstown Plaza Assoc. v. General Nutrition Center, 597 A.2d 1049 (Md. Ct. Spc . App. 1991)(combination of loss of anchor tenant and major infestation of shopping center by rodents held to constitute constructive eviction).

[39]778 S.W.2d 423 (Tenn. 1989).

[40]*Id.* at 428.

[41]The court also made a point of indicating that all of the communications that constituted the wrongful eviction in the *Tenn-Tex* case were done by the landlord's legal counsel. *Id.* at _____.

[42]Echo Consulting Services, Inc. v. North Conway Bank, 669 A.2d 227 (N.H. 1995).

[43]1996 Minn. App. LEXIS 47 (Minn. Ct. App., Jan. 16, 1996).

[44]466 S.E.2d 324 (N.C. Ct. App. 1996).

[45] 918 S.W.2d 851 (Mo. Ct. App.1996).

[46] Hidden Ponds of Ontario, Inc. v. Gregory Hresent, 209 A.D.2d 1025, 622 N.Y.S.2d 168, 1994 N.Y. App. Div. LEXIS 12066

[47]See Pylate v. Inabnet, 458 So.2d 1378 (La. App. 2d Cir. 1984) (holding that a lessor guarantees a lessee against all vices and defects in the premises which may prevent their use); Reste Realty Corp. v. Cooper, 251 A.2d 268 (N.J. 1969) (holding that a warranty against latent defects is implied in a commercial lease).

[48]See The Unwarranted Implication of a Warranty of Fitness in Commercial Leases--An Alternative Approach, 41 Vanderbilt L. Rev. 1057, 1080-83 (Oct. 1988). See also 76 A.L.R.4th 928, Implied Warranty of Fitness or Suitability in Commercial Leases--Modern Status (1990).

[49]747 S.W.2d 373 (Tex. 1988).

[50] Echo Consulting Service Inc. v. North Conway Bank, 669 A.2d 227 (N.H. 1195)

[51] Vlatas at p. 670

[52] See Pacific First Bank v. New Morgan Park Corp., 319 Ore. 342; 876 P.2d 761; 1994 Ore. LEXIS 65 (1994) (good faith and fair dealing limited to parties reasonable expectations in the circumstances); Echo Consulting Services, Inc. v. North Conway Bank,140 N.H. 566; 669 A.2d 227; 1995 N.H. LEXIS 192 (1995) (acceleration of rent claim permitted but with duty to provide refund resulting from actual mitigation of damages)

[53] Holy Properties Limited, L. P. v. Kenneth Cole Productions, Inc., 87 N.Y.2d 130; 661 N.E.2d 694; 1995 N.Y. LEXIS 4449; 637 N.Y.S.2d 964 (1995)

[54] See Amoco Oil Company v. Ervin 908 P.2d 493 (Colo. 1995) (landlord is bound by duty of good faith and fair dealing to offer fair rent for a renewal even though lease does not give the tenant a renewal option). Hopefully, for the sake of all the landlords, this case and others like it involving gas stations will be limited to their facts, because the implications for commercial leasing generally are so contrary to the landlord's normal expectations. This case seems to be a good example of how "hard facts make bad law." past.